768 So.2d 542 (2000)
STATE of Louisiana
v.
Jessie D. HOFFMAN.
No. 98-KA-3118.
Supreme Court of Louisiana.
April 11, 2000.
Rehearing Denied May 12, 2000.
*548 Marcia Adele Widder, New Orleans, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, Walter P. Reed, District Attorney, Ronald Thomas Gracianette, Gretna, Kim K. *549 McElwee, Dorothy Ann Pendergast, Metairie, Counsel for Respondent.
TRAYLOR, Justice.[*]
On January 8, 1997, a St. Tammany Parish grand jury indicted the defendant Jessie D. Hoffman, for the first degree murder of Mary "Molly" Elliot, a violation of La.Rev.Stat. 14:30. A jury later found the defendant guilty as charged and, after a sentencing hearing, unanimously recommended a sentence of death. Aggravating circumstances found by the jury included that: the offender was engaged in the perpetration or attempted perpetration of an aggravated kidnapping, armed robbery and aggravated rape; and the offense was committed in an especially heinous, atrocious, or cruel manner. La.Code Crim. Proc. art. 905.4 A(1) & (7). The defendant now appeals his conviction and sentence, raising eighteen assignments of error.

FACTS
On November 28, 1996, Thanksgiving Day, a duck hunter discovered the nude body of a young woman on a makeshift dock by the Middle Pearl River in St. Tammany Parish. The victim had been shot in the head with a single bullet. Later that day, the victim's body was identified by her husband, who reported her missing the previous evening when she failed to meet him for dinner after work. The victim, an account executive with Peter Mayer Advertising, was last seen leaving her Camp Street office in downtown New Orleans on Wednesday, November 27, 1996.
That same evening, November 27, 1996, a couple in New Orleans East found clothing and other items belonging to the victim in a vacant lot, and turned them over to the police. Among the items found were three ATM receipts which the police traced to a Regions Bank in eastern New Orleans. Time-lapse videotaped footage of the ATM area recorded the victim withdrawing money while standing next to an African-American male wearing a jacket with the word "VALET" on it.
Investigating officers from St. Tammany Parish and Orleans Parish went to the Sheraton parking garage in downtown New Orleans where the victim routinely parked her car. The employees of this parking garage wore jackets similar to the one seen in the ATM video. According to the parking garage managers, an employee, Jessie Hoffman, was on break during the time period under investigation. The police subsequently arrested the defendant and took him to headquarters for questioning. When the police asked the defendant his whereabouts during the relevant time period, he first indicated he left work and took a bus to New Orleans East so that he could deliver medicine to his girlfriend. After the investigating officers voiced suspicions about this story, he stated that two armed African-American males forced him into their car. Upon entering the car, he noticed a white female in the back with a towel over her head. The men drove them to an ATM and forced the woman to withdraw money while the defendant stood next to her. After driving a long distance, the men stopped the car near a bridge and told the defendant to "F* * * this b* * * * or I'll kill you and your girlfriend, Roshana." He admitted to having sex with the female who, according to the defendant, was then let out of the car.
The defendant later changed his story and indicated that after they had sex, one of the men armed with a gun walked off with the female. Although the defendant claimed he never heard gunshots, the man came back alone. After the two men dropped the defendant off, he took a bus back to work. Upon further questioning, the defendant made his final videotaped statement in which he admitted that he had kidnapped, robbed, had sex with, and shot the victim during a struggle over the gun.
*550 Evidence introduced at trial showed that Jessie Hoffman kidnaped Ms. Elliot at gunpoint, in her own car, as she was leaving the Sheraton parking garage after a long day at work. Hoffman then forced Ms. Elliot, at gunpoint, to drive to an ATM machine to withdraw money from her account so that he could rob her. The ATM video tape shows the terror on Ms. Elliot's face as she withdrew money from her account, and Hoffman can be seen standing next to his victim. Two hundred dollars were withdrawn from the ATM, and a statement from Hoffman's girlfriend indicated that she and Hoffman went shopping soon thereafter, and that Hoffman paid cash for several items.
Hoffman did not leave Ms. Elliot at the ATM machine after he had already caused the most horrific night of her life, by both kidnaping and robbing her at gunpoint. Instead, he forced her, still at gunpoint, to drive with him to a remote area of St. Tammany Parish. Ms. Elliot often begged Hoffman not to hurt her, and he answered that he would not because she was cooperating. Hoffman even said that Ms. Elliot "offered herself" while begging him not to hurt her. Hoffman, still armed with a handgun, then had sexual intercourse with his victim at a secluded, desolate area of St. Tammany Parish where he had forced her to drive. The jury did not believe Hoffman's contention, that the sex he had with Ms. Elliot, while Hoffman was armed with a handgun, in the back of Ms. Elliot's own car, was consensual, and found aggravated rape as an aggravating circumstance.
Even after kidnaping, robbing, and raping Ms. Elliot, all of which were done at gunpoint, Hoffman did not allow her to leave. Instead, he forced her, still at gunpoint, while she was still completely nude subsequent to her rape, to get out of her car and march down a dirt path which was overgrown with vegetation and in an area full of trash used as a dump. Her death march ultimately ended at a small, makeshift dock at the end of this path, where she was forced to kneel and shot in the head, execution style. Ms. Elliot likely survived for a few minutes after being shot, but she was left on the dock, completely nude on a cold November evening, to die.
After kidnaping, robbing, raping, and shooting Ms. Elliot, Hoffman disposed of her belongings and his gun, then returned to work. Hoffman's "lunch hour," as he told his managers he would be taking, lasted approximately two and one-half hours.
At trial, the State presented DNA and serological evidence linking the defendant to the crime, along with Hoffman's video-taped statement. Although the defense never contested the defendant shot the victim, the defense introduced the testimony of one witness, Dr. Friedman, who contested the validity of the DNA results. The defense's main argument at the guilt phase focused on rebutting evidence of specific intent to kill by relying on the defendant's videotaped statement in which he explained the gun accidentally firing during a struggle with the victim.
The jury convicted the defendant of first degree murder. The following day, the trial court conducted the capital sentencing hearing. The State first reintroduced all its evidence from the guilt phase. Next, the State called the victim's husband and mother to testify regarding victim impact evidence.
The defense presented testimony from eleven witnesses, including family members and friends, a clinical psychologist, and an expert in executive clemency and corrections.
Following the penalty phase, the jury returned with a recommendation of death after finding all the aggravating circumstances advanced by the State. The trial court formally sentenced the defendant to death by lethal injection on September 11, 1998. The defendant now appeals his conviction and sentence, urging eighteen assignments of error.

*551 DISCUSSION

PRETRIAL ISSUES

VENUE

Assignment of Error No. 1
In his first assignment of error, Hoffman claims the trial court erred in denying his motion for a change of venue due to extensive and inflammatory media coverage in St. Tammany Parish. Defense counsel raised the venue issue before the trial court on two occasions. The trial court first addressed the motion on the third day of voir dire by noting that:
The court again reflects upon the now fifty-four individuals who have been on the panel. And the court acknowledges that many of these fifty-four did recall pre-trial publicity. But upon being interrogated by the court and by counsel for the State, as well as the defense, these individuals, the majority of individuals testified that they could, that they had not formed a preconceived opinion as to the guilt or innocence of the defendant, and that they could rely solely upon the evidence that will be brought forth in this trial in reaching a decision if they were in fact chosen as a juror.
The court in coming to its decision relies upon the case such as the Oklahoma bombing situation, which received national publicity on television daily, pictures of the scene. And a change of venue was granted in that instance. But there we had 180-something people killed. But still those people that sat on that jury were exposed to the same publicity media as any other major offense. So I think, in this day and time, where we have media coverage in the form of television, radio, newspaper, to such an extent, that this could be an issue in most any type of case where the alleged facts are of such a heinous nature.
And the way that a court, and the way that the system has to handle it is to question under voir dire these people who are being considered for jury duty, and to make a determination if they have, if they are rehabilitated or have no fixed opinion. And based upon that, the court denies the motion for a change of venue.
The trial court again denied the defense motion for a change venue after the State presented five witnesses during the guilt phase. The trial court, after considering the arguments by both parties and the evidence submitted by the defense which included newspaper clippings, videotapes, and transcripts gave the following oral reasons for denying the motion:
A total of one hundred eight persons were seated in panels of eighteen for voir dire. Of these, one hundred one were individually questioned relating to whether or not they had been exposed to any pre-trial publicity, the extent of that publicity, what they may or may not have remembered from that exposure, whether or not they had formed any opinion about the case or about the guilt or innocence of the defendant, and whether or not they could put aside anything they may have been exposed to and decide the case based only on the evidence presented in court on the trial in this matter.
Of these questions, fewer than ten were removed from the prospective jurors impaneled because of pre-trial publicity having affected their ability to be fair or impartial and/or unable to set aside what they have seen or heard in order to decide the case based on the evidence at trial. These either stated what they had been exposed to had led them to form an opinion as the guilt or innocence of the defendant, or had influenced them in forming a preconceived notion as to what the penalty should be in this case. The court observed the jurors' answers, as well as demeanor, and found them to be forthright with their answers. Those prospective jurors who had been exposed to any pre-trial publicity overwhelming indicated that they perceived the information to be only a recitation *552 of the events and recalled no impression that what they had perceived was inflammatory in nature.
The court, after reviewing the accounts submitted into evidence, finds the same. The court finds that the statement made to the press by the district attorney around the time of the incident and the arrest of the defendant was not such that it would prejudice or taint the community jury pool drawn over one and one-half years later. None of those interviewed even mentioned any recollection of such. Most of the pre-trial publicity to which the prospective jurors had been exposed was disseminated shortly after the time of the incident. Over one and one half years have passed since that time.
* * *
And the court will also state that in the tapes reviewed of the television stations whose tapes were produced, the most not most, but a good bit of the coverage was contemporaneous with the calling of this jury venire; that is, commencing Sunday or Monday night, there were television news clips concerning this trial. This would be still, I guess, somewhat pre-trial publicity, but the court recalls that it admonished the entire jury pool on Monday, at the very outset, to avoid any contact with the media and not to read any newspaper accounts, listen to any radio broadcasts or to watch any television programs concerning this.
The court notes that during the extensive voir dire proceeding, many of those jurors interrogated reflected that they had followed the admonition of the Court and had avoided any such coverage. In accordance with all of the above stated reasons, the court finds that the defendant has failed to prove that by reason of prejudice existing in the public mind or because of undue influence or that for any other reason he cannot obtain a fair and impartial trial in this parish and venue. The Court, therefore, denied the defendant's motion for change of venue.
A defendant is guaranteed an impartial jury and fair trial. La. Const. art. I, § 16; State v. Brown, 496 So.2d 261, 263 (La.1986); State v. Bell, 315 So.2d 307 (La.1975). To accomplish this, the law provides for a change of venue when a defendant establishes inability to obtain an impartial jury or fair trial in the original venue. Bell, 315 So.2d at 309; Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 1419-20, 10 L.Ed.2d 663 (1963). In unusual circumstances, prejudice against the defendant may be presumed. State v. David, 425 So.2d 1241, 1246 (La.1983). Absent unusual circumstances, the defendant bears the burden of showing actual prejudice. State v. Vaccaro, 411 So.2d 415, 423-24 (La.1982); State v. Adams, 394 So.2d 1204, 1207-1208 (La.1981); State v. Williams, 385 So.2d 214, 215-17 (La.1980), cert. denied, 449 U.S. 1017, 101 S.Ct. 580, 66 L.Ed.2d 478 (1980); State v. Felde, 382 So.2d 1384 (La.1980). Whether the defendant has made the requisite showing of actual prejudice is "a question addressed to the trial court's sound discretion which will not be disturbed on appeal absent an affirmative showing of error and abuse of discretion." State v. Wilson, 467 So.2d 503, 512 (La.1985), cert. denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985).
Changes of venue are governed by La. Code Crim. Proc. art. 622, which provides:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
*553 Several factors are pertinent in determining whether actual prejudice exists, rendering a change in venue necessary, including: (1) the nature of pretrial publicity and the degree to which it has circulated in the community; (2) the connection of government officials with the release of the publicity; (3) the length of time between the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is to be drawn; (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. Brown, 496 So.2d at 263; Bell, 315 So.2d at 311. Because a defendant is not entitled to a jury entirely ignorant of his case, he cannot meet his burden by merely showing a general level of public awareness of the case. Brown, 496 So.2d at 263.
The defendant now urges that several factors precluded him from receiving a fair trial in St. Tammany Parish. First, the defendant maintains the instant offense "riveted the public and engendered extensive media coverage in the newspapers, television and radio." The defendant references the December 27, 1998, Slidell Edition of the Times-Picayune which listed the two-week trial of this case among its "top ten" news stories of the year.[2]
The trial occurred in June of 1998, one and one-half years after the murder and initial flurry of publicity. The widespread publicity and community outrage generated by the crime is not disputed. However, this event must be viewed against the backdrop of fear and desperation caused by a crime wave that engulfed both St. Tammany and Orleans in November of 1996. First, as the videotaped and printed news reports submitted by the defense reveal, the murder of Molly Elliot shared the spotlight with an armed robbery and triple murder at the Louisiana Pizza Kitchen in the French Quarter. According to a Times-Picayune article covering the Pizza Kitchen slayings, "the triple murder capped a week of violence" which included the Elliot murder, along with the much publicized murders of two security guards outside a popular eastern New Orleans nightclub. Fifteen homicides occurred during the Thanksgiving holidays of 1996. Tara Young, Pizza Kitchen Killings Rock French Quarter, TIMES-PICAYUNE, Dec. 2, 1996, at A1. Thus, news coverage at the time of the Elliot murder focused not only on the horrific details of each incident, but also emphasized the amount of crime affecting the city as a whole. It should also be noted the primary murder discussed in this article was not even the murder of Ms. Elliot, it was the triple murder at the Louisiana Pizza Kitchen.
Next, the defendant takes issue with news accounts mentioning his confession and the videotaped footage of the victim and the defendant near the ATM. Both were introduced at trial. However, as the trial court recounted in its reasons for denying the venue motion, most prospective jurors questioned during individual voir dire knew only the basic facts surrounding the instant case, rather than specific details. Very few prospective jurors remembered anything about the confession or videotape.
Additionally, although the defendant strenuously objects to news coverage suggesting he may have had a juvenile record, a review of the media exhibits attached to the defense brief reveals otherwise. Initially, this court notes the news reports submitted stressed the defendant's lack of an adult criminal record. As for the defendant's contention that the media repeatedly *554 alluded to a non-existent juvenile record, this allegation is completely unfounded and misrepresents news accounts focusing on the defendant and his family. The defense brief continuously refers to televised reports informing viewers that the defendant "was no stranger to police." However, when the complained-of footage is viewed in its entirety, the tone is complimentary towards the defendant, rather than derogatory. First, the much criticized "no stranger to police" comment emphasizes the defendant's participation in a police sponsored athletic league. This information followed the newscaster's description of the defendant as a high school graduate and former star quarterback. The news clip ended with interviews featuring the defendant's brother, mother, and a close friend all expressing bewilderment as to how the defendant could be involved in such a horrific crime. Newspaper articles also stressed the defendant's lack of a criminal history. An article from the Slidell Sentry-News quotes James Hartman, a public information officer from the St. Tammany Parish Sheriff's Office as stating, "We're very surprised that he had no criminal record ... He allegedly went from nothing right to robbery, kidnapping, rape and murder." Kevin Chiri, Man Admits to Area Killing, SLIDELL SENTRY-NEWS, Dec. 1, 1996, at 1A. Thus, while coverage of the offense was extensive, closer inspection reveals that it was not as prejudicial toward the defendant as the defendant now claims.
Next, the defendant complains St. Tammany officials frequently appeared on television discussing details of the murder investigation. Specifically, the St. Tammany District Attorney, Walter Reed, voiced his opinion about the defendant's guilt and made clear that this case would send a message to New Orleans criminals. However, as the trial court reasoned above, these comments occurred immediately following the incident. Moreover, none of the prospective jurors individually questioned during voir dire even recalled the statements made by Mr. Reed. The fact that none of the prospective jurors remembered this specific statement proves the statement certainly did not cause prejudice against Jessie Hoffman in the public mind.
Finally, the defendant contends news coverage aroused racial prejudices. Specifically, the defendant points to a televised interview with a St. Tammany citizen who told reporters that "[n]othing that happens in New Orleans surprises me over in that zoo. That's why we live over here in God's country to get away from all that nonsense across the lake."[3] Notwithstanding possible racial overtones of that remark, this type of commentary was both isolated and uncommon, and certainly not reflective of comments by actual or prospective jurors.
Although the defendant asserts moving the trial to Orleans Parish would have diminished the racial tensions surrounding his case, that venue would present the same problems caused by pretrial publicity given that the kidnaping and armed robbery occurred within the borders of Orleans Parish. Certainly, news coverage of the offense was just as extensive. In fact, after the rash of Thanksgiving murders discussed above, including the murder of Ms. Elliot, enraged New Orleans citizens marched on City Hall demanding safe streets. Against this backdrop, it does not appear that a jury pool made up of Orleans Parish residents would have constituted a sympathetic audience.[4] Perhaps the biggest flaw in this argument is that many of the articles and news broadcasts cited by the defendant were either broadcasts by New Orleans television stations, or newspaper articles which were circulated in the New Orleans area. Moving the trial to *555 New Orleans to escape pre-trial publicity is a ludicrous proposition.
Moreover, this court and the United States Supreme Court have often examined the number of jurors excused for cause for having fixed an opinion as a gauge of whether prejudice exists in the public mind. This is an appropriate rule, and this court will apply it in this case. It is not specifically clear from case law what minimum level of exposure illustrates a corrupted atmosphere which would mandate venue transfer; however, this case is more similar to cases in which jurors' level of exposure did not require a change of venue. See, e.g., State v. Connolly, 96-1680, p. 5 (La.7/1/97), 700 So.2d 810 (although 86.33%, one hundred twenty out of one hundred thirty-nine, potential jurors possessed some knowledge about the crime, most had only a vague recollection of the surrounding facts); State v. Wilson, 467 So.2d 503, 513 (La.1985) ("Although a majority of prospective jurors, i.e., twenty-four of thirty-nine, admitted exposure to pretrial publicity, only four were excused for cause on ground of their formation of a fixed opinion.... A review of the responses by potential jurors on voir dire does not reveal the existence of collective community prejudice which could have denied defendant a fair trial before impartial jurors."); State v. Rodrigue, 409 So.2d 556, 559 (La.1982) (in a mock voir dire set up in order to determine the impact of media coverage by the court, twenty-six of thirty prospective jurors had read about the case, but only nine had fixed an opinion which satisfied the court that a jury could be chosen in that parish); State v. David, 425 So.2d at 1247 (out of one hundred twelve jurors, twenty-seven had read or heard about the case, but only six of those twenty-seven had an opinion, and all four of those jurors who said that they could put their opinion aside were excused for cause). Compare, State v. Clark, 442 So.2d 1129, 1133 (La.1983) (motion for change of venue granted based on dry run voir dire in which thirty-seven of thirty-eight jurors recalled details of crime and only six out of twenty-four jurors in the last two groups questioned indicated that their knowledge would not affect their decision).
According to information gathered during voir dire, approximately eighty percent (seventy-two out of ninety) of the prospective jurors had awareness of the case before trial. While this percentage appears significantly high, a close examination of the individual jurors' responses on voir dire reveals most of the jurors had only a rudimentary knowledge of the basic facts surrounding the case. The transcript of the voir dire examination which lasted six and one-half days shows the trial court questioned each prospective juror individually in painstaking detail concerning his or her knowledge of the instant case, and opinions concerning the defendant's guilt or innocence.[5] In fact, the trial court excused only five prospective jurors for cause (of one hundred eighty called for examination) on grounds of formation of a fixed opinion due to pretrial publicity, a percentage within the parameters of the relevant case law.[6] Finally, as the trial court stated, much of the news coverage *556 coincided with the calling of the jury venire; thus, the trial court's admonition instructing the prospective jurors to avoid news coverage of the case would have substantially reduced the possibility of publicity tainting the jury pool. In these circumstances, the defendant's claim that the trial court erred in failing to change venue has no merit and does not present reversible error.

SUPPRESSION OF STATEMENT

Assignment of Error No. 14
The defendant maintains his statements to the police should have been suppressed as fruits of an illegal arrest, alleging the police took him into custody without probable cause. Following his arrest, the defendant made several statements, including a videotaped confession admitted at trial over defense objection.
A warrantless arrest in a public place is not "illegal" if there is probable cause. United States v. Watson, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). Generally, probable cause for a warrantless arrest exists when facts and circumstances known to an arresting officer, and of which he has reasonably trustworthy information, are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed a crime. Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); State v. Scales, 93-2003, p. 6 (La.5/22/95), 655 So.2d 1326, 1331, cert. denied 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996); State v. Marks, 337 So.2d 1177, 1181 (La.1976); La.Code.Crim. Proc. art. 213.
In the case at hand, police reports outlining the investigation indicate probable cause to arrest existed. First, after the police received ATM receipts with the victim's account number, they viewed time-lapse videotaped ATM footage showing the victim standing next to an African-American male wearing a dark colored jacket with the word "VALET" in white letters printed on the back. This jacket matched uniforms of employees at the Sheraton parking garage in New Orleans where the victim routinely parked her car. According to the parking garage managers, Hoffman, who was employed as a valet, disappeared during the two and one-half hour time period after the victim had left her office. The defendant explained his absence by informing his managers his brother had been shot six times in the Fisher Housing Projects. However, police officers verified there had been no reports of a shooting at that location. Additionally, the victim's car was found near the Iberville Housing Projects, about seven blocks from the garage. Finally, the managers of the parking garage viewed photographs taken from the videotaped ATM footage and indicated the man standing next to the victim looked like Hoffman; however, they could not make a positive identification. Under these facts, there was probable cause to arrest Hoffman. See State v. Curry, 400 So.2d 614, 615 (La.1981)("The coincidence of man with red checked shirt, the man with blue jacket, the information of armed robbery and attempt to murder earlier that day, information that cab had been abandoned in Franklin, altogether.. constituted probable cause to arrest the suspects...."). The police had probable cause to arrest Hoffman, so no statements which were introduced needed to be suppressed as fruit of an unconstitutional arrest. Thus, the defendant's argument is without merit and does not present reversible error.

VOIR DIRE ISSUES

BATSON

Assignment of Error No. 2
In this assignment of error, the defendant claims the trial court erred in denying his Batson challenges because the State used peremptory challenges to exclude two of the only three African-Americans from the venire without giving sufficient race-neutral explanations. The third African-American juror, Mr. Cooper, was *557 removed when the trial court granted the State's cause challenge.[7] An all-white jury resulted.
According to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), a defendant must first establish a prima facie case of discrimination by showing challenges were directed at members of a cognizable group, these challenges were peremptory, and other relevant circumstances that raised an inference that the prosecutor used his peremptory challenges to exclude potential jurors on the basis of race. The burden of production then shifts to the State to provide a race-neutral explanation. The neutral explanation offered by the prosecution must be one which is clear, reasonable, specific, legitimate, and related to the case at bar. State v. Collier, 553 So.2d 815, 820 (La.1989). If the race-neutral explanation is tendered, the trial court must decide, in step three, whether the defendant has proven purposeful discrimination. Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), reh'g denied 515 U.S. 1170, 115 S.Ct. 2635, 132 L.Ed.2d 874 (1995). The ultimate burden of persuasion remains on the defendant to prove purposeful discrimination. Id., see also Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).
According to the defendant, Mr. Galatas, the first African-American struck by the State, appeared to be an ideal juror for the prosecution because he had relatives in law enforcement and previously served on a jury which convicted. However, the State exercised a peremptory strike against Mr. Galatas. The defense raised a Batson challenge and the trial court asked the State to provide a race-neutral explanation. The State's reason rested on the juror's hesitant responses as to whether he could consider the death penalty. Prosecutor McElwee explained:
When we were here, what I call "chambers out of the courtroom," Mr. Reed [district attorney] asked Mr. Galatas if he could consider the death penalty. And as we watched him, he sat there and he hesitated and his exact words were, "I think I could." Then Mr. Reed asked him if he could consider life, no reservation, he said, "I could."
We go back out in the courtroom, Mr. Reed again asked the individuals of the panel if they could consider the death penalty. He again hesitated and gave a very weak "I think I could." Mr. Reed couldn't hear him. He had to ask him, what did you say? And at that point, he said "I could." This is the racially neutral reason. I don't care what color he is. We are looking for people who have strong feelings, or strong opinions about the death penalty. I don't think he will do it, even though he said he could. I don't think he is capable of it.
The prosecutor also emphasized white jurors struck by the State due to weakness on the death penalty.[8] In the same way, the State contended Mr. Galatas demonstrated reluctance to the death penalty when he hesitated before responding, "I think I could," in such a low voice that the prosecutor asked the juror to repeat his *558 answer. Finding the State's reason racially neutral, the trial court allowed the State to exercise a peremptory challenge on Mr. Galatas and overruled the defendant's Batson challenge.
The defendant first takes issue with the characterization of Mr. Galatas's responses as weak, arguing that his use of the word "thinks" with respect to his ability to vote for the death penalty followed naturally from the prosecutor's question to the juror:
Prosecutor: The law of Louisiana says that you have to be able to consider the death penalty. Do you think you can do that?
Mr. Galatas: I think I could, yes.
In addition, during the prosecutor's questioning of the entire panel, Mr. Galatas answered, "Yes," when asked if he could consider the death penalty.
While these exchanges tend to support the defendant's contention, they do not convey the totality of the circumstances. Upon continued questioning about the death penalty, Mr. Galatas clearly waivered:
Prosecutor: You say you think you could. Can you do it or not?
Mr. Galatas: The reason I say I think I could, I couldn't until I heard the facts. I couldn't tell you whether I could or couldn't. I have to hear all the facts first.
Prosecutor: So as it should be. But we have to know if you would consider.
Mr. Galatas: If the facts lead that way, I could.
Prosecutor: The law says also that you have to not only be able to consider the death penalty, you also have to be able to consider life, life imprisonment. Those would be the only two sentences: Death or life. Do you think
Mr. Galatas: Depending on what the circumstances are, which we haven't heard them yet.
Prosecutor: Do you think you could also consider life imprisonment as a possible sentence?
Mr. Galatas: I could.
Thus, the entire discussion between the prosecutor and Mr. Galatas supports the State's argument that the prospective juror appeared reluctant in his death penalty responses. Additionally, when questioned regarding consideration of life imprisonment, Mr. Galatas answered affirmatively without equivocation.
The defendant also maintains that Mr. Galatas was the only juror in this panel the prosecutor questioned exclusively during in-chambers examination about ability to consider the death penalty without having first provided testimony to prompt such an inquiry. After calling the panel of prospective jurors, the trial court conducted individualized voir dire because of extensive pretrial publicity. The transcript shows that when prospective jurors indicated that they had no exposure to pretrial publicity, questioning by the trial court and the attorneys for the defense and State was very brief. However, if prospective jurors, like Mr. Galatas, expressed knowledge about the case, both sides engaged in a thorough examination often including questions about the death penalty.[9] Furthermore, although the defendant claims that Mr. Galatas was the only prospective juror subjected to intense death penalty questioning by the prosecution, in the same way, defense counsel rigorously examined Mr. Carruthers after he indicated the death penalty was an appropriate sentence for first degree murder. Thus, a fair reading of the record reveals that Mr. Galatas was not singled out by the prosecution; instead, both sides subjected all prospective jurors to in-depth questioning based on pretrial publicity exposure. *559 Contrary to Hoffman's claim, no particular questions were asked, or not asked, merely because Mr. Galatas was African-American. Moreover, defense counsel had the opportunity to rehabilitate Mr. Galatas following the prosecutor's inquiry about the death penalty; however, defense counsel refrained from asking any death penalty questions at that time. Finally, as discussed above, the State struck white jurors who similarly hesitated when questioned about ability to consider the death penalty. In light of these explanations, the trial court properly denied this Batson challenge.
Next, the defendant argues, in his original, reply, and supplemental briefs, that the State's racially neutral reason for striking Ms. Malter was pretextual in light of her ability to consider the death penalty. However, the State maintained it was exercising a peremptory challenge against Ms. Malter because she rated herself a "one" on the decisive scale. The prosecutor further contended that "during the course of discussion ... she had a concerned look on her face with one hand placed here and the other arm underneath her. Her body language was inappropriate for someone who is a decisive individual." Finally, the prosecutor admitted finding Ms. Malter's actions disturbing after she looked the defendant in the eye and smiled at him while indicating that she could give the defendant a fair trial. The trial court overruled the defense's objection, and found that the prosecutor responded with a racially neutral reason.
As the defendant correctly emphasizes, and the transcript has been corrected to reflect, Ms. Malter rated herself "about five" on the decisiveness scale. The defendant claims that Ms. Malter should not have been struck because her rating on the decisiveness scale was a five, and that white prospective jurors with similar ratings were not struck. However, some of the confusion regarding this point is because the two questioning prosecutors used two different "decisiveness" scales.
District Attorney Reed said someone who was a one on his scale was "... a very wishy-washy person who can't decide anything ..." and a ten on his scale "... makes a decision right off the bat, without considering all the evidence ..." Mr. Reed told the prospective jurors that a ten did not consider all the evidence and jumped to conclusions, and specifically told them he wanted people in the middle.
Assistant District Attorney Gracianette used a different scale with the fourth panel of jurors. His scale was designed for jurors to rate themselves highly if they were decisive and can make tough decisions. Prospective jurors were told that one was, "... very indecisive, wishy-washy ...," and ten was "very decisive when it comes to making important decisions ... can make a decision you are comfortable with, even a hard decision ..." It was implicit that the jurors should rate on the high end. These two scales were clearly different.
Each jury panel was dealt with separately, so Ms. Malter, who rated herself a five on the scale proposed by Assistant District Attorney Gracianette did not even hear the scale proposed by Mr. Reed. The court also notes that the State exercised a peremptory challenge on Ms. Wampler, who indicated she was a five. The jurors selected from the panel which contained Ms. Malter were Juror Burkhaldt (eight), Juror Conner (eight), Juror McDonald (nine), and Juror Miller (eight).
Furthermore, peremptory challenges by the prosecutor based on body language have survived Batson challenges when accepted by a trial judge, who possesses broad discretion in making the ultimate factual determination regarding purposeful discrimination. See e.g., United States v. Bentley-Smith, 2 F.3d 1368, 1375 (5th Cir. 1993) ("The reason certainly is stronger if the attorney is able to articulate an objective fact, such as that the juror was slow in answering questions or had to have questions repeated .... [but] the judge is free, *560 based upon all the information presented and that judge's eyewitness observation of counsel, to conclude that the reason is offered in good faith and not as a subterfuge for race."); State v. Williams, 96-1023, pp. 32-33 (La.1/21/98), 708 So.2d 703, 727 (State's assertion that juror appeared "weak, scary, and shaky on the death penalty" accepted as race-neutral reason when considered in the context of body language, etc.); State v. Seals, 95-0305, p. 8 (La.11/25/96), 684 So.2d 368, 374-75 (noting important factors include body language, lack of eye contact, the failure to make eye contact and juror inattention); State v. Aubrey, 609 So.2d 1183, 1187 (La. App. 3d Cir.1992) (venire woman who maintained excessive eye contact with one of defendants was race neutral reason); State v. Johnson, 621 So.2d 1167, 1171 (La.App. 2d Cir.1993), writ denied, 626 So.2d 1178 (La.1993), (venire woman appeared disinterested and unresponsive); State v. Manuel, 517 So.2d 374, 376 (La. App. 5th Cir.1987) (unresponsiveness to the proceeding); State v. Griffin, 618 So.2d 680, 694 (La.App. 2d Cir.1993) (venire woman dismissed because of wavering responses during voir dire and because she was all smiles and giggles during voir dire on the death penalty). The prosecutor's reasons constituted "legitimate" grounds for the exercise of a peremptory strike. Purkett v. Elem, 115 S.Ct. at 1771 ("What [Batson] means by a `legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection.").
In light of the aforementioned case law interpreting Batson challenges, the defendant's argument lacks merit and presents no reversible error. Once race-neutral reasons are provided, the issue of whether a prima facie case has been established is moot. Hernandez, supra, 500 U.S. at 359, 111 S.Ct. at 1866; State v. Green, 655 So.2d 272, 280 (La.1995). The trial judge was well within his discretion to allow the peremptory challenges in light of the race-neutral reasons provided by the prosecution.

CAUSE CHALLENGES

Assignment of Error No. 11
Next, Hoffman contends the trial court erred by denying his challenges for cause of three prospective jurors due to pretrial publicity exposure, preconceived notions of Hoffman's guilt, and inability to follow the capital punishment scheme.
A capital defendant has twelve peremptory challenges. La.Code Crim. Proc. art. 799. Prejudice is presumed when a trial court erroneously denies a challenge for cause and the defendant has exhausted his peremptory challenges. An erroneous ruling depriving an accused of a peremptory challenge violates substantial rights and constitutes reversible error. State v. Cross, 93-1189, at p. 6 (La.6/30/95), 658 So.2d 683, 686; State v. Bourque, 622 So.2d 198, 225 (La.1993). A trial court is vested with broad discretion in ruling on challenges for cause, and these rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. State v. Cross, supra, 93-1189 at pp. 6-7, 658 So.2d at 686-87; State v. Robertson, 92-2660 (La.1/24/94), 630 So.2d 1278, 1281. A trial judge's refusal to excuse a prospective juror for cause is not an abuse of discretion, notwithstanding that the juror has voiced an opinion seemingly prejudicial to the defense, when subsequently, on further inquiry or instruction, the juror demonstrates a willingness and ability to decide the case impartially according to the law and evidence. State v. Robertson, supra; State v. Cross, supra.
The defense exhausted its peremptory challenges. Consequently, prejudice must be presumed from an error by the trial court in ruling on cause challenges, and this court must review denials of the defendant's cause challenges on their merits.

Ms. Meyer
The defendant claims the trial court should have granted his challenge for cause based on Ms. Meyer's exposure *561 to pretrial publicity. However, when individually questioned by the trial court as to formation of a preconceived opinion about the defendant's guilt or innocence, she replied, "I honestly don't know because I sure don't remember much of the case. I know at the time we discussed it within my office, but at this point I do not remember much of the case at all." She also stated she had no memory of the defendant's name in connection with the instant case. Moreover, Ms. Meyer twice answered in the affirmative after the trial court asked her if she could disregard pretrial publicity she had heard or seen and rely solely on the evidence presented. She then reiterated these statements during the State's examination. While Ms. Meyer recalled that she considered the facts of the case a "horrible crime,"[10] and believed the perpetrator should receive the death penalty when she first heard about the case, she admitted that "it's very easy to make a statement," in favor of the death penalty, but "in all actuality it comes down, you have to listen to both sides." Finally, she gave a clear indication of impartiality when she assured defense counsel she could "separate the difference between what conversation that I had heard two years ago versus what I heard in the courtroom." Thus, a review of her answers supports the trial court's conclusion that although Ms. Meyer was exposed to pretrial publicity, she was not influenced as to be incapable of rendering a fair and impartial verdict.
In addition, Hoffman's later challenge to Ms. Meyer based on failure to consider youth and lack of a criminal history as mitigating circumstances is equally without merit, given that she eventually stated she could consider all factors submitted during the penalty phase. She also indicated she could consider life imprisonment, and would not automatically vote for the death penalty. Finally, she stated vengeance would not impact her sentencing decision. Based on the totality of her responses, the defendant does not establish that the trial court abused its discretion by denying his cause challenge because Ms. Meyer had sufficiently rehabilitated herself with respect to mitigation. Therefore, the defendant claiming that Ms. Meyer should have been excused for cause is not meritorious.

Ms. Miller
The defendant also complains Ms. Miller's exposure to media coverage predisposed her towards the defendant's guilt.[11] In the defendant's view, Ms. Miller gave a "vague, equivocal" response to the trial court's question as to whether she could put what she heard aside and base the verdict on the evidence. Specifically, she answered, "I think that I could. Coming into the jury pool, I sort oflike, I was going to have preconceived notions, but I don't know anything about this defendant, so I think I could." Standing alone, this response may seem ambiguous; however, a review of her entire voir dire examination indicates her opinion would yield to evidence presented. Ms. Miller twice acknowledged that media accounts were frequently inaccurate, and further stated she could decide based on facts presented at trial.
Next, the defendant maintains Ms. Miller should have been removed because, like Ms. Meyer, she admitted initially thinking the perpetrator should be executed. However, similar to Ms. Meyer, she clarified her answer by stating "[w]hen you make a statement like that, you see a crime like this, it's a reaction. People are tired of crime and we are tired of being afraid, so it's a reactionary thing. I really feel like I *562 could follow the law and consider what needs to be considered." Moreover, she indicated she could consider mitigating circumstances and life imprisonment. Under these circumstances, the trial court properly denied this challenge for cause.

Ms. Conner
The defense also challenged Ms. Conner because she extensively testified she would not consider youth or lack of a criminal record as mitigating. However, she also indicated as a caveat to her testimony that "I don't know what does matter right now, because I don't know anything." Ms. Conner continued, stating, "I understand I have to consider everything, all the facts that have been presented. So it would have to make, have to be a part of my decision." When further questioned by defense counsel as to her ability to consider youth and lack of a criminal record as mitigating as the law required, she responded affirmatively. She also stated she could consider life imprisonment and the death penalty.
As an initial matter, the record reflects defense counsel challenged Ms. Conner based on her young age, rather than inability to consider mitigating circumstances. Regardless, given her subsequent rehabilitation, the trial court acted within its discretion by denying Hoffman's cause challenge of Ms. Conner.
As part of this assignment of error, the defendant maintains Mr. Chisham and Ms. Lower were accepted as jurors by the State and the defense despite inability to follow the law. As the defendant concedes, defense counsel failed to challenge these jurors for cause, thereby waiving any complaint of them. La.Code Crim. Proc. art. 841; State v. Taylor, 93-2201, p. 7 (La.2/28/96), 669 So.2d 364, 369. However, given the defendant's alternative framing of the issue as an ineffective assistance of counsel claim, this court will address the alleged errors.

Mr. Chisham
The defendant contends the trial court should have struck Mr. Chisham based on predisposition towards the death penalty and inability to consider the defendant's lack of a prior record. Initially, in response to defense counsel's question as to whether everyone found guilty of first degree murder should get the death penalty, Mr. Chisham answered, "That's a tough question ... And I really don't have an answer. I'd like to give you an answer, but I don't have it." However, when asked again by defense counsel, Mr. Chisham indicated that all persons convicted of first degree murder should receive the death penalty. He also testified he would not consider the defendant's lack of a prior criminal history as a mitigating circumstance.
At this point, several prospective jurors similarly expressed that a finding of first degree murder mandated a death sentence and further stated they would not consider the absence of a criminal record as mitigating, although their earlier responses indicated otherwise. Following an off the record discussion with the attorneys, the trial court addressed the prospective jurors with respect to bifurcated proceedings and the sentencing phase. The trial court's comments indicate that defense counsel's examination confused the jury panel. Specifically, the trial court noted:
Now, let me share one thing with you, and I find, and I sometimes tell this to the lawyers, but the purpose of this voir dire is to select impartial jurors, not give them instructions on the law and then quiz you on it. But I have heard here two things today. This morning when the question was put to you, could you consider in the penalty stage imposing the death penalty or imposing life imprisonment, each one of you, who have said now that they could not consider that on a first degree murder conviction, answered that they could.
After the trial court completed its lecture, defense counsel resumed questioning, *563 again asking whether the jurors would automatically vote for the imposition of the death penalty based on a first degree murder verdict. While some members of the jury panel continued to answer affirmatively, Mr. Chisham replied, "After his [trial court's] explanation, I understand a little better, little clearer. No, it wouldn't be automatic." He also stated life imprisonment was a possibility. Finally, Mr. Chisham indicated that vengeance would not play a part in his sentencing decision. Consequently, it appears his "death-prone" responses were attributed to juror confusion, rather than his true beliefs. In light of Mr. Chisham's unequivocal, final answers indicating willingness to consider life imprisonment and the death penalty, the defendant's claim is without merit and presents no reversible error.

Ms. Lower
Next, the defendant challenges Ms. Lower's ability to remain impartial because her brother was murdered by a hitchhiker never brought to justice. However, as the defendant concedes, Ms. Lower indicated her brother's death would not affect her ability to follow the law, including the consideration of mitigating circumstances. She further stated she could give both the State and defense a fair trial. Thus, the defendant's complaint about Ms. Lower's alleged bias is baseless.
The defendant also contends Ms. Lower would not consider youth and lack of a criminal record as mitigating circumstances. Ms. Lower initially stated that she would make her decision based on the "facts of the case," rather than the defendant's age or lack of a criminal history. Thus, in the defendant's view, "her understanding of what constituted a mitigating circumstance was limited to proof that the killing was unintentional." However, the defendant's claim is undercut by Ms. Lower's later response declaring, "I am sure, like you said, there may be mitigating circumstances and you would take those into consideration before you decide." Ms. Lower's answers indicated she would not solely consider aggravating circumstances; instead, she would consider all of the circumstances. More importantly, whatever confusion existed in Ms. Lower's mind as to what constituted a mitigating circumstance, she made clear, on more than one occasion, that she would not automatically impose the death penalty if the defendant was found guilty of first degree murder. Thus, the defendant's claim that Ms. Lower's presence on the jury rendered the recommendation of the death penalty unreliable lacks merit and presents no reversible error.

GUILT PHASE ISSUES

VIDEO EVIDENCE

Assignment of Error No. 12
The defendant asserts the trial court erred by allowing introduction of a videotape of the victim withdrawing money from an ATM. The defendant does not challenge the videotape's relevancy; rather, he argues it should have been excluded under La.Code Evid.. art. 403, which provides for exclusion of otherwise relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice.
During the testimony of Detective Demma, the State introduced and published Exhibit 11, a series of still photographs made from the time-lapse footage from the ATM camera. Later, during the testimony of Detective Oswald, the State introduced into evidence Exhibit 76, a conventional videotape made from the time-lapse footage, which the officer identified as an "accurate reflection of what is on the original." Mr. Holland, security director for Regions Bank, previously testified the original required transferral to a VHS tape for viewing purposes. He further indicated the copy accurately reflected the surveillance recorded on the original videotape.
When the State sought to play the tape for the jury, the defense objected, arguing the tape was cumulative of the still photographs *564 already published to the jury. Defense counsel also contended the tape was extremely prejudicial based on his observation of the jury's emotional reactions after viewing the stills. The trial court overruled the objection and the State played the videotape for the jury. After the jury viewed the videotape, defense counsel lodged another objection stating that "there was an intentional attempt to change the original version, so that there would be a longer viewing of the perpetrator." The trial court again overruled the objection, noting that both the stills and the videotape were essential.[12]
The rules for admitting photographic evidence at trial also govern videotape. State v. Davis, 92-1623, pp. 23-24(La.5/23/94), 637 So.2d 1012, 1025-26; State v. Garrison, 400 So.2d 874, 881 (La. 1981). The evidence is therefore admissible if it is "shown to have been accurately taken, to be a correct representation of the subject in controversy, and when they shed light upon the matter before the court." State v. Strickland, 398 So.2d 1062, 1065 (La.1981). This court has upheld the admission of videotapes depicting the commission of the crime. Garrison, supra, 400 So.2d at 881.
As discussed above, two witnesses for the State verified that the video copy accurately reproduced the original. Defense counsel did not challenge these statements on cross-examination nor did he present any evidence to dispute the validity of the videotaped copy. See La. Code Evid. art. 1003 (allows for the introduction of a duplicate, defined by art. 1001(5) as a "counterpart ... which accurately reproduces the original"); State v. Jackson, 714 So.2d 87, 95 (La.App.2d Cir.5/13/98), writ denied, 98-1778 (La.11/6/98), 727 So.2d 444 (despite defense objection, "911" tape introduced into evidence after being sent to the FBI and local production company to be "cleaned up" admissible absent showing that content of copy does not accurately reflect original); State v. Hensley, 608 So.2d 664, 667-668 (La.App. 3d Cir.1992), writ denied, 92-3100 (La.2/19/93), 613 So.2d 972 (admission of photocopies of stolen money in lieu of actual currency not grounds for reversal in armed robbery trial absent any evidence that defendant was prejudiced or allegation that photocopies were not accurate reproduction of currency); see also State v. Lewis, 567 So.2d 726, 728-29 (La. App. 2d Cir.1990), writ denied, 99-2404 (La.2/8/91), 575 So.2d 364 (typed copy of original admissible where officer testified copy was correct reflection of original and defense presented no evidence to the contrary); State v. Harriman, 469 So.2d 298, 304-05 (La.App. 2d Cir.1985) (duplicate coroner's protocol admissible absent indication that it did not accurately reflect original). Furthermore, the State introducing the videotape in addition to the stills, even if it is somewhat cumulative, does not bar its introduction. Garrison, supra, 400 So.2d at 881. In any event, given counsel's concession of the defendant's guilt, introduction of the stills and videotape almost certainly did not contribute to the jury's verdict. This assignment is without merit and presents no reversible error.

GRUESOME PHOTOGRAPHS

Assignment of Error No. 13
Next, the defendant claims the trial court erred by admitting prejudicial photographs which included gruesome crime scene and autopsy pictures.
The State is entitled to the moral force of its evidence, and post-mortem photographs of murder victims are *565 admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, as well as location, and placement of wounds, and to provide positive identification of the victim. State v. Koon, 96-1208, p. 34 (La.5/20/97), 704 So.2d 756, 776 (orig.hrg); State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526, 532, n. 8, citing State v. Martin, 93-0285, p. 14 (La.10/17/94), 645 So.2d 190, 198; State v. Watson, 449 So.2d 1321, 1326 (La.1984), cert. denied 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985). Photographic evidence will be admitted unless it is so gruesome that it overwhelms jurors' reason and leads them to convict without sufficient other evidence. State v. Koon, supra, (citing State v. Perry, 502 So.2d 543, 558-59 (La.1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987)).
The six crime scene photographs were relevant to show manner of death and location of the victim's body. Contrary to the defendant's claim, the photographs were not cumulative of one another because they depicted the crime scene from different angles and distances. As for the autopsy photographs, these pictures illustrated the coroner's testimony while he described the location of the victim's wound, angle of entry, and other injuries the victim suffered to her knees, wrist, and right arm. Furthermore, photographs showing the location of the victim's body were especially relevant to refute the defense claim that the victim was shot during a struggle with the defendant. Although the defendant complains about Photograph 32, showing the victim's bloody toes which resulted from possible rodent mutilation, defense counsel brought this gruesome fact to the jury's attention during cross-examination of the coroner. Thus, the defendant fails to show the photographs were clearly more prejudicial than probative. This Court should not and will not interfere in the trial court's exercise of its broad discretion to admit this evidence which was beneficial to the jury in reaching a verdict and sentence. This assignment is meritless and presents no reversible error.

DNA TESTING

Assignment of Error No. 15
By this assignment, the defendant claims the trial court erred by admitting the State's DNA evidence because the State failed to meet its burden of demonstrating the reliability of the test results.
At the pretrial admissibility hearing, the State called Anne Montgomery, director of operations at ReliaGene Technologies. The trial court accepted her as an expert in molecular biology and DNA analysis. Ms. Montgomery testified extensively regarding credentials of her testing facility and strict controls used to insure the accuracy of its work. She then explained that she used Polymerase Chain Reaction ("PCR") testing because it is the preferred method when the sample is small and relatively degraded like the sample in this case. Ms. Montgomery contrasted PCR testing with Restriction Fragment Length Polymorphism ("RFLP") testing which requires a large sample size with little degradation. According to Ms. Montgomery, the results for ten genetic markers tested at her lab indicated a match between the sperm cells obtained from the crime scene samples and samples obtained from the defendant, and a match between epithelial cells from the crime scene evidence and the victim's DNA. Based on these results, she concluded the defendant could not be excluded as a source of the samples tested, and further testified that "the frequency of these profiles exceeds one billion individuals in each of the three race groups, the Caucasians, the African-Americans, the Hispanics."
The defendant now complains the State did not introduce any evidence showing the source of the population statistics used by the State's expert or establishing the independence of each allele used in the DNA testing. In addition, the defendant challenges the integrity of the victim's *566 rape kit by alleging possible contamination occurred during storage at the St. Tammany Parish Sheriff's Office.
La.Rev.Stat. 15:441.1 states, in part, that:
[e]vidence of deoxyribonucleic acid profiles,... offered to establish the identity of the offender of any crime is relevant as proof in conformity with the Louisiana Code of Evidence.
The Louisiana legislature clearly intended this type of evidence to be admissible absent a showing the evidence is unreliable. This court has adopted the reasoning and observations set forth in Daubert v. Merrell-Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which specifically rejected the "general acceptance" test and outlined the means for determining reliability and answered many questions as to proper standards for admissibility of expert scientific testimony. State v. Foret, 628 So.2d 1116, 1122 (La.11/30/93). In Daubert, supra, the United States Supreme Court stated an inference or assertion of scientific knowledge must be derived by the scientific method. Proposed testimony must be supported by appropriate validation, i.e., "good grounds," based on what is known. Daubert, 113 S.Ct. at 2795. In short, evidentiary reliability will be based on scientific validity. Id., at 2795, n. 9. The trial court must determine whether the expert is proposing to testify to scientific knowledge assisting the trier of fact to understand or determine a fact in issue. The court must make "a ... preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts at issue ... Many factors will bear on the inquiry...." Id., 113 S.Ct. at 2796. "General acceptance" can have a bearing on the inquiry. Id., 113 S.Ct. at 2797. Thus, due to the uncontroverted testimony presented in this case, the trial court adequately served its role as "gatekeeper" and only allowed in the DNA evidence after finding it would assist the jury, was founded on generally accepted principles, and was reliable. See also State v. Quatrevingt, 93-1644 (La.2/28/96), 670 So.2d 197.
Though the defendant now disputes the reliability of the methods used to analyze the DNA evidence presented by the State, defense trial counsel bears some of the responsibility for failure to raise these issues during the pretrial admissibility hearing. Instead, defense trial counsel failed to mention these concerns during cross-examination of Ms. Montgomery and then merely lodged a general objection after the trial court ruled that the DNA results were admissible. Moreover, the defendant offered no experts or other supporting evidence to rebut the expert's claim that her methods were reliable and generally accepted by the scientific community. See United States v. Beasley, 102 F.3d 1440, 1446-47 (8th Cir.1996), cert. denied, 520 U.S. 1246, 117 S.Ct. 1856, 137 L.Ed.2d 1058 (1997); (PCR analysis reliable and admissible under Daubert standards); United States v. Hicks, 103 F.3d 837, 845-46 (9th Cir.1996), cert. denied, 520 U.S. 1193, 117 S.Ct. 1483, 137 L.Ed.2d 694 (1997) (same). In fact, the defense expert in molecular genetics and DNA analysis, Dr. Friedman, testified that the DNA analysis performed in the instant case was widely accepted and adopted by the FBI, although he disagreed with Ms. Montgomery's conclusions. As for the defendant's claim of rape kit contamination, defense counsel was afforded the opportunity to cross-examine the State's witnesses on this subject, but chose not to do so. Even now, the defendant offers nothing more than his bare allegation in support of his claim. Hence, on this record, the trial court did not err by admitting the DNA evidence. In any event, the DNA results revealing that the defendant could not be excluded as the source of the sperm are merely cumulative given that even the defense conceded the defendant had sexual intercourse with the victim. Consequently, this *567 assignment is without merit and does not present reversible error.

VICTIM IMPACT EVIDENCEGUILT PHASE

Assignment of Error No. 7
By this assignment, the defendant complains the State introduced extensive victim impact evidence at the guilt phase through the testimony of the victim's supervisor and victim's husband. Both witnesses testified to relevant factual matters concerning contact with the victim the day of the murder. However, the defendant maintains the State went beyond the proper scope of examination by eliciting testimony about the victim's good character.
First, when the prosecutor asked the victim's husband to describe the victim, he testified (without objection) as follows:
Molly was about five-ten. She was a very intelligent person, a very warm person, a very trusting person. She was the kind of person that usually looked for the good in any person and would generally opt to trust someone rather than not trust them when she had met somebody. She was quick with a laugh. She loved jokes and we used to play jokes on each other. And she was a very loving person. I think that's why we had all the animals. It was just an outlet for us to have more things to love and to be around us. She had lots of friends. I never knew anybody who was a better person.
The victim's husband also testified the victim hated handguns and belonged to a gun-control organization.
Next, the victim's supervisor testified regarding the victim's duties as an account executive and their professional relationship. He also described the victim as "[a] special person. She, she was a terrific listener. She was energetic, bright, intelligent."
This Court does not believe anything said by these witnesses at the guilt phase of trial constitutes victim impact evidence. State v. Bernard, 608 So.2d 966 (La.1992) defines victim-impact testimony as evidence of the character of the victim, evidence of the emotional, physical, and economic impact of the crime on the family of the murdered victim, and evidence of the survivors' opinions of the crime and of the murderer. Id. at 967-68. This court has held that evidence of the survivors' opinions of the crime and of the murderer are clearly irrelevant to any issue at a sentencing hearing. Id. at 970. Thus, "victim-impact evidence" has a highly specific meaning. Because this evidence was not offered in the penalty phase to illustrate the impact of the crime, it should not be described as such. Even if this testimony was irrelevant, it was hardly prejudicial, considering it merely humanized the deceased victim and did not overly detail the victim's good qualities.
The defendant also contends the State elicited "utterly irrelevant" testimony from the victim's husband concerning his actions in attempting to locate his wife the evening of her murder. However, factual testimony offered by the victim's husband describing his unsuccessful attempts to locate his wife and his contact with the police was clearly admissible to show the initial investigation of the crime. His testimony was not given in the context of describing the impact the victim's death had on him, and is not properly characterized as victim-impact evidence. See State v. Gradley, 97-0641, (La.5/19/98), 745 So.2d 1160 (testimony of various family members about how they found the victim's body hidden in a closet with a chest of drawers blocking the closet door entrance, and the impact of that sight on them at the time, did not constitute "victim impact" testimony but simply provided jurors with relevant evidence about crime scene and initial stages of police investigation into the brutal murder).
In a related claim, the defendant argues that the prosecutor improperly capitalized on this testimony during closing arguments by vividly describing the plight *568 of the victim's husband as he frantically searched for his wife.[13] He further contends the prosecutor inappropriately referred to the victim's personal characteristics.[14]
However, the prosecutor simply related how the events unfolded by paraphrasing the testimony of the victim's husband with respect to how he searched for his wife and ultimately identified her body. Furthermore, the prosecutor's references to the victim's personal characteristics did not descend into a detailed description of the victim, but highlighted the testimony given by the victim's husband and her supervisor. In any event, these comments made by the prosecutor were not objected to by defense counsel and consequently are barred from review. La. Code Crim. Proc. art. 841; State v. Taylor, 93-2201, p. 7 (La.2/28/96), 669 So.2d 364, 369. We adhere to the rule set forth in Taylor, that the scope of review in capital cases will be limited to alleged errors occurring during the guilt phase that are contemporaneously objected to, and that errors during the sentencing phase will be reviewed whether objected to or not. Taylor, 669 So.2d at 369. Even if we were to assume that defense counsel did not commit this procedural default, if we consider the prosecutor's remarks in their entirety, they were not so prejudicial as to undermine confidence in the reliability of the jury's verdict and thereby implicate the fundamental fairness of the proceedings. Thus, this assignment is meritless under our present or former standard and presents no reversible error.

PENALTY PHASE ISSUES

VICTIM IMPACT EVIDENCEPENALTY PHASE

Assignment of Error No. 7
In this assignment of error, the defendant maintains that the victim impact testimony introduced at the penalty phase exceeded the bounds of State v. Bernard, 608 So.2d 966 (La.1992). Justice Lemmon, writing for this court in Bernard, stated:
... some evidence of the murder victim's character and of the impact of the murder on the victim's survivors is admissible as relevant to the circumstances of the offense or the character and propensities of the offender. To the extent that such evidence reasonably shows that the murderer knew or should have known that the victim, like himself, was a unique person and that the victim had or probably had survivors, and the murderer nevertheless proceeded to commit the crime, the evidence bears on the murderer's character traits and moral culpability, and is relevant to his character *569 and propensities as well as to the circumstances of the crime. However, introduction of detailed descriptions of the good qualities of the victim or particularized narrations of the emotional, psychological and economic sufferings of the victim's survivors, which go beyond the purpose of showing the victim's individual identity and verifying the existence of survivors reasonably expected to grieve and suffer because of the murder, treads dangerously on the possibility of reversal because of the influence of arbitrary factors on the jury's sentencing decision.
In defendant's view, the testimony of the victim's mother and the victim's husband was "appropriate for a memorial service," but not for the penalty phase of a trial involving a "racially charged capital crime."
The State first called the victim's husband, Andrew Elliot, whose testimony amounted to only three pages. The defendant now argues Mr. Elliot gave objectionable testimony when he described the country home he shared with the victim, surrounded by a broad expanse of land and many animals. Next, the State presented the testimony of the victim's mother, Roxie Stouffer. The defendant complains that Mrs. Stouffer described the happiness she felt when her daughter was born by testifying that "she was this wonderful, baldheaded bundle of energy and laughter and joy. She grew up and she has fabulous little freckles on her face and the smile that would just absolutely break your heart ... [w]hen Molly walked into a room and smiled, the whole room just lights up. It's just the most amazing thing to see."
Contrary to the defendant's claims, this testimony falls within the confines set out by Bernard. As this court further noted in Bernard, detailed descriptions of good qualities of the victim or particularized narrations of sufferings of survivors beyond the purpose of showing victim's individual identity and verifying the existence of survivors reasonably expected to grieve tread dangerously close to reversible error because of influence of arbitrary factors on jury's sentencing decision in a capital case. Bernard, 608 So.2d at 971.
In the Elliot Murder, the State presented two witnesses who did not give detailed lists or descriptions of the victim's good qualities, nor did they give a lengthy particularized narration of the emotional and psychological sufferings of themselves or the other survivors. See State v. Taylor, 93-2201, p. 12 (La.2/28/96), 669 So.2d 364, 371 (in finding the victim impact evidence was harmless, the court believed that the jury regarded the testimony of these victim impact witnesses as normal human reactions to the death of a loved one). Consequently, this assignment lacks merit and presents no reversible error.

TRIAL COURT RESPONSES

Assignments of Error Nos. 4 and 5
By these assignments of error, the defendant, in his original, reply, and supplemental briefs, first complains the trial court's response to the jury's question renders his death sentence unreliable. During penalty phase deliberations, the jury sent the judge a note with the following question: "If Jesse Hoffman had any kind of juvenile record, would the State have access to it and would we have been aware of it?" Over defense counsel's objection, the trial court concluded that the answer would be: "This question cannot be answered."[15] Defense counsel had argued that a more appropriate answer would be to inform the jury their question was improper and further contended pretrial news coverage of the offense suggested the defendant had a juvenile record. In response to defense counsel's argument, the trial court stated:

*570 For the record, the court further reflects that was not brought forth in the trial of the matter and is outside the scope of any evidence in the form of live testimony or otherwise being introduced and it would be improper in that regard as well.
The defendant now contends the trial court's response "created a grave risk that the jury improperly rejected uncontroverted mitigating evidence" and encouraged the jury to base its sentencing decision "on the basis of rank speculation regarding the existence of a phantom juvenile record."
The defendant's fears regarding pretrial publicity about his alleged juvenile record are unfounded. First, as discussed in assignment of error number one, news accounts concerning the defendant were positive and emphasized achievements as a football player. In fact, the only news coverage referencing a prior arrest aired after voir dire examination started, eliminating the possibility of tainting the venire. Moreover, as the defendant emphasizes, lack of criminal history was the subject of uncontroverted testimony by both State and defense witnesses. During the guilt phase, the State presented testimony of the defendant's managers from the parking garage. They both verified a background check of the defendant during the hiring process did not reveal a prior criminal record. The defense psychologist also testified the defendant had no prior experience with "criminal behavior." Furthermore, members of the defendant's family, along with his football coach, testified that the defendant did not have a history of run-ins with the law.[16] Additionally, in its jury instructions during the penalty phase, the trial court included the specific mitigating circumstance set out in La.Code Crim. Proc. art. 905.5(a): "the offender has no significant prior history of criminal activity." Finally, the trial court gave jurors a copy of the statutory mitigating factors before they retired to deliberate. In Louisiana, a sentence of death shall only be imposed if the jury considers all of the mitigating circumstances and determines that death is an appropriate sentence. La.Code Crim. Proc. art. 905.3 (emphasis added). We believe that there is proof in the record, including the jury's inquiry into whether there was any juvenile record, to establish that the jury considered mitigating factors in compliance with La.Code Crim. Proc. art. 905.3.
A sentencer may not be precluded from considering, as a mitigating factor, any aspect of a defendant's character which law allows to be proffered as a basis for a sentence less than death. Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (Texas jury must consider defendant's history of mental illness, as mitigating factor). As outlined above, the jury ultimately considered the mitigating circumstance the defendant presented that he had no significant prior record.
From a practical standpoint, Hoffman's proposed answer only slightly differs from the trial court answer. The defendant fails to show a significant difference exists between the answer provided by the trial court, i.e., "This question cannot be answered," and the response suggested by defense counsel, i.e., "This question is improper." Neither answer would have resolved the issue for the jury, and the defendant's attempt to predict the impact on the jury amounts to nothing more than unfounded speculation. See La. Code Evid. art. 606(B) (absent claim of misconduct, inquiry into "juror's mind or emotions" or "mental processes" improper).
The defendant now argues the trial court, at the very least, should have instructed the jurors that they were to confine *571 deliberations to matters in evidence, and asserts the trial court should have gone even further by explaining that the State could have discovered the defendant's juvenile records, if they existed, and would have been permitted to present evidence of juvenile adjudications if the offenses would have been a felony if committed by an adult. However, this court has disapproved of any further explanation of statutory mitigating circumstances and their function in jury deliberations. State v. Flowers, 441 So.2d 707, 716 (La.1983), cert. denied, 466 U.S. 945, 104 S.Ct. 1931, 80 L.Ed.2d 476 (1984) rev'd on other grounds, 779 F.2d 1115 (5th Cir.1986).
Finally, the defendant's reliance upon Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) is misplaced. In Simmons, the defendant was tried for capital murder in South Carolina, where his prior record rendered him statutorily ineligible for parole if he received a life sentence. The prosecutor argued the defendant's future dangerousness in the penalty phase closing argument, and asked for a death verdict as "an act of self defense" on behalf of society. Defense counsel's requests that the jury be instructed about defendant's parole ineligibility were denied. When the jury sent a note specifically asking about the defendant's parole eligibility, the judge told them this was not a proper issue for consideration, and sent them to deliberate further. Simmons, 512 U.S. at 159, 114 S.Ct. at 2191-92. The United States Supreme Court observed that the defendant's federal due process rights had been violated because the trial judge's actions "had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration." Simmons, 512 U.S. at 163, 114 S.Ct. at 2193.
Here, the trial court's response did not create a "false choice" for the jury in light of its previous instruction on mitigating circumstances which included the defendant's lack of a criminal history. If anything, the trial court's answer was designed to focus the jury's attention on evidence properly introduced at the penalty phase. Furthermore, as discussed above, both the State and the defense emphasized the defendant's clean criminal history. More importantly, unlike the prosecutor in Simmons who encouraged jurors to return a death sentence because of the defendant's future dangerousness, the prosecutor in the instant case did not interject issues broader than the defendant's background and the circumstances of his crime at the sentencing stage. Accordingly, this claim is without merit and presents no reversible error.
In a related assignment, the defendant complains the trial court's failure to respond to the jury's instruction in open court requires reversal of his sentence. In the defendant's view, the trial court's written response violates La.Code Crim. Proc. art. 808 which provides the trial court shall reinstruct the jury in the presence of the defendant, his counsel, and the prosecutor. As an initial matter, the defense lodged no objection to the trial court answering the jury's written question with a written response rather than a verbal answer in open court. However, because the error occurred during the penalty phase of a capital case, such a failure does not prevent this court from reviewing errors raised for the first time on appeal. State v. Taylor, 93-2201, p. 7 (La.2/28/96), 669 So.2d 364, 369; see also State v. Wessinger, 98-1234, pp. 19-20 (La.5/28/99), 736 So.2d 162, 180-81. In any event, even assuming that the trial court erred by not orally responding to the jury's question in the presence of defense counsel and the defendant, prejudice cannot be shown. As noted above, both the State and defense attorneys were present during the trial court's discussion of the jury's question.[17] *572 Arguably, the response to the jury's question in this case would have been the same, even if that response had been given in open court with the jury and the defendant and his counsel present, under the provisions of La.Code Crim. Proc. art. 808. Consequently, this portion of the defendant's assignment lacks merit and presents no reversible error.

PENALTY PHASE INSTRUCTIONS

Assignments of Error No. 6, 8, 9, and 18
By his sixth assignment of error, Hoffman argues the trial court erred in refusing to give the defense's requested penalty phase instructions. However, a review of the requested instructions reveals that the charges merely restated the law regarding the jury's consideration of mitigating circumstances. Specifically, the defendant requested the trial court charge the jury that: (1) the aggravating and mitigating circumstances were not to be weighed against each other; (2) the absence of mitigating circumstances did not require the jury to impose the death penalty; (3) the jury has the option to impose a life sentence without any evidentiary basis; and (4) the individual jurors should consider the views of others but should not surrender their own view with respect to the weight of a mitigating circumstance for the sake of the group.
Instead, the trial court, in its charge on mitigation, instructed the jury that "[y]ou are required to consider the existence of aggravating and mitigating circumstances in deciding which sentence should be imposed." The trial court further charged the jury that "If, however, you do not unanimously find, beyond a reasonable doubt, that a statutory aggravating circumstance existed, then life imprisonment without benefit of parole, probation, or suspension of sentence is the only sentence that you maythat may be imposed." More importantly, the trial court informed the jury that the finding of an aggravating circumstance does not require the death penalty. The trial court also cautioned the jury that upon finding an aggravating circumstance, they must also consider any mitigating circumstances before imposing a death sentence. The trial court then listed all of the mitigating circumstances and explained that in addition to the specifically provided mitigating circumstances, "[y]ou must also consider any other relevant mitigating circumstance. You're not limited to those mitigating circumstances which are defined. You may consider any other relevant circumstances which you feel should mitigate the severity of the penalty to be imposed." Finally, the trial court instructed the jury not to "surrender your honest belief as to the opinion of your fellow jurors or for the mere purpose of returning a verdict."
Thus, it appears the trial court thoroughly covered the law relative to mitigation. Furthermore, the instructions read by the trial court were almost verbatim to the penalty phase charges found in the Louisiana Judges' Criminal Bench Book, § 3.10, p. 25; § 7.03, pp. 105-107 (Louisiana Judicial College, 1993). Accordingly, the defendant has no cause to complain simply because the trial court declined to read the specific charges sought by the defendant given that they were already (at least for the most part) encompassed in the trial court's instructions. See La.Code Crim. Proc. art. 807 ("A requested special charge ... need not be given if it is included in the general charge or in another special charge to be given."); State v. Segers, 355 So.2d 238, 244 (La.1978). The court did not give either the defendant's or its own charge on the role of "grace" in Louisiana's capital sentencing scheme; i.e., that even without any evidence of mitigating circumstances, *573 and in the face of the State's proof of one or more aggravating circumstances, the jury remains free to return with a life sentence. Although the court has approved such an instruction, State v. Martin, 550 So.2d 568, 573-74 (La.1989); State v. Watson, 449 So.2d 1321, 1327-28 (La. 1984), it has not required it in the absence of an explicit request for clarification from the jury. Martin, 550 So.2d at 574. Additionally, the Benchbook accordingly does not include the charge in its pattern instructions. This assignment is without merit and presents no reversible error.
In his eighth assignment of error, the defendant contends the trial court's instructions erroneously splintered the aggravating circumstance set forth in La. Code Crim. Proc. art. 905.4(A)(1) into three separate aggravating circumstances, i.e., armed robbery, aggravated kidnapping, and aggravated rape. The jury found all three of these aggravating circumstances. The defendant now complains that the "trial court's charge and the jury's finding that the single aggravating factor based on enumerated felonies comprised three separate aggravating factors unfairly bolstered the State's case for death."
Before addressing the merits of how many aggravating circumstances are present in this case, this court reaffirms that only one aggravating circumstance, which is clearly supported by the record, needs to be found for a death sentence to be affirmed, provided the introduction of evidence of the invalid aggravating circumstance or circumstances does not inject any arbitrary factors in the proceeding. State v. Hamilton, 92-1919, pp. 17-18 (La.9/5/96), 681 So.2d 1217, 1227-28; State v. Thompson, 516 So.2d 349, 356-57 (La. 1987).
Preliminarily, the defendant does not challenge the jury's finding of the three enumerated felonies set out in La.Code Crim. Proc. art. 905.4(A)(1), given the substantial evidence presented at trial showing the defendant committed aggravated kidnapping, armed robbery, and aggravated rape. Instead, the defendant complains the jury's finding constituted one aggravating circumstance rather than three aggravating circumstances.
This argument presumes the jury must find that the aggravating circumstances "outweigh" the mitigating circumstances before it recommends death. However, as the defendant concedes, Louisiana is not a weighing state. It does not require capital juries to weigh or balance mitigating factors against aggravating factors, one against the other, according to any particular standard. State v. Hamilton, 92-1919, pp. 17-18 (La.9/5/96), 681 So.2d 1217, 1227-28; State ex rel. Busby v. Butler, 538 So.2d 164, 173-74 (La.1988). Because Louisiana is a non-weighing state, the failure of one aggravating circumstance does not invalidate a death sentence so long as another aggravating circumstance has been proven beyond a reasonable doubt and the introduction of evidence of the aggravating circumstance does not inject an arbitrary factor into the proceeding. State v. Hamilton, 681 So.2d at 1217, (citing State v. Wille, 559 So.2d 1321, 1341, n. 16 (La.1990), citing Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983)). There is no prohibition in state statutes, state jurisprudence, or federal jurisprudence that prohibits the use of all the facts surrounding a criminal offense to charge an individual. As the evidence clearly supported an aggravating circumstance (the crime was committed during the perpetration of an aggravated kidnapping, armed robbery, and aggravated rape), which is sufficient to subject a defendant to a death sentence under Louisiana law, and there is no reason to presume that the jury did not consider, as properly instructed, the mitigating circumstances, the defendant fails to demonstrate bias justifying reversal.
The defendant also contends in assignment of error nine that the trial court erred in instructing the jury on the *574 aggravating circumstance of heinous, atrocious or cruel set out in La.Code Crim. Proc. art. 905.4(A)(7). In defendant's view, the trial court's description of the aggravating circumstance, "[t]he offense was committed in an especially heinous, atrocious, or cruel manner in that the victim was subject to torture, serious physical abuse, or pitiless infliction of unnecessary pain and suffering," is unconstitutionally vague.
The charge in this case comes from Section 7.03 of the Louisiana Judges' Criminal Bench Book and the comments to that section note that the language of the charge satisfies the "narrowing construction" required by Maynard v. Cartwright, 486 U.S. 356, 362-66, 108 S.Ct. 1853, 1858-60, 100 L.Ed.2d 372 (1988). In Maynard, the United States Supreme Court declared an aggravating circumstance referring to "especially heinous, atrocious or cruel" murders unconstitutionally vague under the Eighth Amendment, as applied. Maynard recognized such a provision could be saved with a limiting construction which required proof of torture, serious physical abuse, or some other refinement. In light of the charge given by the trial court in the instant case, the defendant's claim fails on the merits.
The defendant further argues that the jury finding that the crime was especially heinous under La.Code Crim. Proc. art. 905.4(A)(7) is not supported by the evidence.
A crime committed in an especially heinous or cruel manner requires a finding of torture or the pitiless infliction of unnecessary pain. State v. Brogdon, 457 So.2d 616, 631 (La.1984); State v. Flowers, 441 So.2d 707, 718 (La.1983), cert. denied, 466 U.S. 945, 104 S.Ct. 1931, 80 L.Ed.2d 476 (1984), rev'd on other grounds, 779 F.2d 1115 (5th Cir.1986); State v. Taylor, 422 So.2d 109, 117-18 (La.1982). In State v. Wilson, 467 So.2d 503 (La.1985), the victim was shot once in the head and neck from a distance of no less than twenty-four inches with a sawed-off, 12-gauge shotgun. The left side of the victim's face and many of his teeth were blown away. This Court found the wound grossly disfiguring and gruesome, and the manner of the killing could not be considered less than cruel in the generally accepted meaning of the word. Wilson, 467 So.2d at 521. Nonetheless, this court held that the killing did not fall within the category of the cruel, heinous, and atrocious crimes contemplated by the statute. Id.
Although we specifically found that the crime committed in Wilson was not committed in what would be cruel, heinous and atrocious as a matter of law, we nonetheless affirmed the imposition of the death penalty because the introduction of the alleged aggravating circumstance[s] did not inject any arbitrary factors into the proceeding. Id. at 522. In fact, the primary reason the death penalty was affirmed in Wilson was because the defendant was engaged in an attempted armed robbery when the victim was killed. Id.
Wilson provides support that the perpetrator engaging in a felony which constitutes an aggravating circumstance under La.Code Crim. Proc. art. 905.4(A)(1) is sufficient to affirm a death sentence. The facts of the instant case are much more extreme than in Wilson. There was only sufficient evidence in Wilson to prove that the defendant was engaged in an armed robbery, or the attempt thereof. Reliance upon Wilson allows for an affirmation of Hoffman's sentence even if the armed robbery, which the jury found to have occurred beyond a reasonable doubt, was the only aggravating circumstance. The jury also found beyond a reasonable doubt that Hoffman was engaged in two other felonies, specifically, aggravated kidnaping and aggravated rape. Any one of these felonies, in and of itself, is sufficient to affirm Hoffman's sentence. This makes an inquiry into whether the murder was committed in an especially heinous, atrocious or cruel matter irrelevant.
*575 Even if we were to find that the killing itself involved no elements of torture or pitiless infliction of unnecessary pain to support the jury's finding of this statutory aggravating circumstance, the failure of one statutory aggravating circumstance does not invalidate others, properly found, unless introduction of evidence in support of the invalid circumstance interjects an arbitrary factor into the proceedings. State v. Martin, 93-0285, p. 20 (La.10/17/94), 645 So.2d 190, 201; State v. Deboue, 552 So.2d 355, 368 (La.1989), cert. denied, 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 174 (1990); State v. Byrne, 483 So.2d 564, 575 (La.1986).
Evidence of what the defense argues to be an invalid aggravating circumstance did not interject an arbitrary factor into these proceedings because evidence of the manner in which the offense was committed, and of the nature of the victim's injuries, were all relevant and properly admitted at trial. Because evidence supporting other aggravating circumstances was part of the facts surrounding the murder, none of this evidence interjected an arbitrary factor. State v. Roy, 681 So.2d 1230, 1242 (La.1996).
In any event, during the State's closing argument at the penalty phase, the prosecutor did not argue that the offense was committed in an especially heinous or cruel manner, although the trial court instructed the jury on this aggravating circumstance and included the factor on the list furnished to the jury. Accordingly, no evidence was adduced to independently prove specifically the existence of that circumstance. However, the jury was fully informed of the circumstances surrounding the victim's death. Instead, the prosecutor emphasized the three felonies committed by the defendant throughout the victim's ordeal, i.e., aggravated kidnapping, aggravated rape, and armed robbery, as the aggravating circumstance proven by the State. See La.Code Crim. Proc. art. 905.4(A)(1).
Comparatively, in Wilson, the fact that the murderer was engaged in an attempted armed robbery was in and of itself sufficient to affirm a death sentence. In this case, Jessie Hoffman committed aggravated kidnaping, armed robbery, and aggravated rape. This court affirms its position in Wilson, and likewise, any one of the aggravating circumstances found in the Ms. Elliot murder committed by Hoffman is sufficient to warrant the death penalty. As a result, this claim is without merit, and presents no reversible error.
In his last assignment of error under this heading, the defendant complains the commutation instruction given by the trial court invites arbitrary and capricious imposition of the death penalty. However, the defendant's attack on La.Code Crim. Proc. art. 905.2(B), which authorizes a jury instruction on the governor's power to commute both a life and death sentence, fails on the merits. Justice Johnson, writing for this court in State v. Loyd, 96-1805, p. 18 (La.2/13/97), 689 So.2d 1321, 1331 upheld La.Code Crim. Proc. art. 905.2(B) against challenges that the statute violates state and federal ex post facto clauses, the United States Constitution's Eighth Amendment and the federal Due Process Clause. This assignment is meritless and presents no reversible error.

MISCELLANEOUS

INEFFECTIVE ASSISTANCE OF COUNSEL AT GUILTY PHASE

Assignment of Error No. 3
Next, the defendant claims that counsel rendered ineffective assistance at the guilt phase of trial.
Under the standard for ineffective assistance of counsel set out in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and Lockhart v. Fretwell, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), which standard was adopted[18] by this Court in State v. Washington, *576 491 So.2d 1337, 1339 (La.1986), a reviewing court must reverse a conviction if the defendant establishes (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's inadequate performance prejudiced defendant to the extent that the trial was rendered unfair and the verdict suspect, or whether counsel's constitutionally ineffective performance affects the outcome of the plea process.
At the guilt phase, the defendant makes his strongest argument for ineffective assistance based on counsel's "blaming the victim" strategy which earned the defense team a scathing editorial in the Times-Picayune.
First, in his opening statement, counsel argued to the jury:
The facts are going to show that Molly Elliot was not prepared to go into the lion's den every day. I am not saying anything bad about Molly. But she wasn't prepared to go to the 300 block of Camp Street every day of her working life and walk two blocks in the dark to a car on the seventh floor of a dark parking lot and deal with what she had to deal with. (Emphasis added by defendant).
For whatever reason, he [defendant] walks to the side of the car, shows the gun, and says, "Give me your money." Mary says, "I don't have any. I don't have any money." Well, the window is down. he tries to open the door. Now, the car is runningthis is what I mean by a young lady unprepared. The car is running at a red light. He tries to open the door. The door is locked. "Open the door." She opens the door. He gets in and they end up at this ATM. He gets two hundred dollars. (Emphasis added by defendant).
In his [defendant's] recount of the circumstances [of the rape], he doesn't indicate thatand when you hear them, maybe you will believe it. There's not vicious, ugly, mean, harassing talking going on. At one point she said, "Please don't kill me," and he answers, "Why would you think I would kill you, you're cooperating." And at one point she says, "Look, please don't kill me. You can have anything you want. You can have me."
I am not, I am not saying that it is not rape. I am not saying that. I can only imagine what's in her mind. What I am saying is, that all the information that you are going to receive in this case, there will not be one iota of information that suggests that Jessie told this lady, "I am going to rape you." Her clothes are not torn off. She's not beaten up. Her clothes are all in order, indicating that she took them off. Remember, I am not saying, I am notI am still not saying it's not rape. I'm sure she was terrified, but she brought up the subject. The lady was not prepared to go into the lion's den every day. She was not prepared. (Emphasis added by defendant).
Trial counsel continued to imply the victim's naivety contributed to the instant offense. During cross-examination of the victim's mother, counsel tried to establish the victim lacked experience working in the inner city. This tactic ultimately backfired after the victim's mother testified her daughter worked in the Los Angeles area before moving to New Orleans. Next, defense counsel sought to emphasize the victim's unpreparedness by asking the victim's husband, Mr. Elliot, about his wife's familiarity with the door and window locks on her car. Mr. Elliot indicated the victim had owned the car for a long time. Counsel also asked the victim's husband whether he "ever ask[ed] her to go through a sort of fire drill or practice session of what to do if certain things happen." Mr. Elliot responded negatively. Finally, counsel *577 elicited testimony from the victim's husband concerning his wife's habit of working late at night.[19]
Notwithstanding the rudeness counsel displayed by urging such an offensive argument to the jury, in light of the overwhelming evidence of the defendant's guilt, this court does not believe counsel's opening statement contributed to the jury's guilty verdict. Even assuming that counsel's remarks inflamed the jury, it is unlikely any resentment the jury may have harbored continued into the penalty phase because counsel wisely avoided blaming the victim during the second stage of trial. More importantly, counsel made an effort at damage control by stating:
I, in my opening statement mentioned to you, that she seemed naive. Believe me, folks, that adds to the tragedy. It does not in any way lessen the tragedy. As far as I know, and as far as any of us know, although we don't really need to think about it, but as far as any of us know, this was a young lady that anyone of us who are old enough would have been proud to call our daughter. A fine young lady who should not have lost her life and to whom the events that happened should not have occurred.
The remainder of counsel's closing appealed for mercy. The public scolding counsel received from the Times-Picayune after his guilt phase argument obviously affected his decision not to link the crime to the victim's lack of "street smarts" while pleading for the jury to spare the defendant's life. The jury was presumably unaware of the critical editorial because it was published after sequestration. Consequently, the defendant's strongest claim of ineffectiveness ultimately fails on the merits and does not present reversible error.
In addition, the defendant's residual claims of ineffectiveness lack merit. First, the defendant complains that his newly-appointed counsel failed to pursue pending pretrial motions filed by his original attorney. Specifically, he asserts that his original attorney filed a motion to suppress the defendant's statements; however, the hearing was limited to the issue of voluntariness. The trial court subsequently denied the motion. Although defendant's original attorney also filed another motion to suppress based on the lack of probable cause, the newly-appointed defense team declined to litigate this issue before the trial court. However, as discussed in assignment of error number fourteen, probable cause existed for the defendant's arrest, so nothing would have been suppressed as the fruit of an illegal arrest. In any event, counsel's decisions as to which motions to file (or in this case, pursue) form a part of trial strategy. See, State v. Smith, 94-0621, pp. 13-14 (La. App. 4th Cir.12/15/94), 647 So.2d 1321, 1329, rev'd on other grounds, 95-0061 (La.7/2/96), 676 So.2d 1068.
Additionally, the defendant claims that newly-appointed counsel failed to pursue the motion for a change of venue filed by his original attorney. Contrary to the defendant's contention, a review of the record indicates that the trial court ruled on the defense motion for a change of venue based on pretrial publicity during the voir dire examination. Furthermore, defense counsel attempted unsuccessfully to relitigate the issue before trial. In any event, this court addressed the substance of the defendant's motion to change venue claim in assignment of error one and found it had no merit and presented no reversible error.
Next, the defendant complains about counsel's voir dire ineptitude. First, the defendant contends counsel "made virtually no efforts to rehabilitate jurors who indicated in response to group questioning that they were generally opposed to the death penalty." However, this court has held counsel's failure to traverse a venire-person *578 expressing opposition to the death penalty does not constitute ineffective assistance. State v. Prejean, 379 So.2d 240, 242-43 (La.1979). The defendant also maintains that counsel failed to seek the removal of prospective jurors, Mr. Chisham and Ms. Lower, who clearly indicated they could not consider a life sentence. As discussed in assignment of error eleven, a review of the record reveals otherwise. Both jurors gave unequivocal, final answers indicating a willingness to consider life imprisonment and the death penalty; thus, counsel had no reason to challenge the jurors for cause.
In addition, the defendant claims counsel failed to object or move for a mistrial after the jury panels were exposed to prejudicial comments. In particular, the defendant points to a remark made by Mr. Laizer, a prospective juror in the second panel, who stated he knew the defense expert in clinical psychology from his work as an attorney and indicated he "would have some difficulty with her." The trial court subsequently held an off the record bench conference after the juror's remark. Given the brief nature of this remark combined with counsel's apparent effort to deflect the panel's attention by discussing the issue off the record, the defendant fails to show counsel acted unprofessionally by not moving for a mistrial. Moreover, the defense brief omits the juror's later removal for cause based partly on the juror's comment reproduced above.
The defendant further contends counsel failed to move for a mistrial after the trial court made a prejudicial remark that criminals often escape justice. However, the transcript reveals a relatively innocuous comment. During the voir dire examination, the trial court actually stated, "That sometimes happens in our system. A lot of criminal activity goes unrewarded, if you will, or unanswered for, simply because it is just because there is so much of it and it's just impossible to catch everyone that does that. Okay." The trial court's remark followed a response from a prospective juror who indicated that the perpetrator who broke into his car had never been caught. Under these circumstances, counsel did not commit professional error. In addition, the time and manner of making objections is part of the trial strategy decision-making of the trial attorney. State v. Simms, 465 So.2d 769, 778 (La.App. 5th Cir.1985); State v. Franklin, 94-0409, p. 12 (La.App. 4th Cir.12/14/94), 648 So.2d 962, 968.
The defendant's next complaint about counsel's failure to conduct voir dire on the issue of racial prejudice is also without merit. As an initial matter, the defendant concedes that counsel questioned some prospective jurors about race, but criticizes counsel's manner of examination.[20] In any event, a defendant may have a constitutional right to question prospective jurors on racial attitudes, Turner v. Murray, 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986), cf. Taylor, 93-2201, 669 So.2d at 382, but counsel's decision to forego interjecting the issue of race explicitly into trial represents a reasonable tactical choice protected by Strickland's presumption of defense counsel's competence.
The defendant also maintains that counsel undermined his presumption of innocence with the following remarks:
[A]nd the State has got a strong case, and maybe you say to yourself, well, what are you doing standing up there
. . .
And much to your surprise, perhaps, the Judge is also going to instruct you on not guilty.
Given the defense strategy of conceding the defendant's involvement, however, these comments do not appear prejudicial. See State v. Burkhalter, 428 So.2d 449, 457 *579 (La.1983) (admission of guilt to second degree murder helped defendant avoid death penalty); State v. Berry, 430 So.2d 1005, 1014-15 (La.1983) (admission of intent to rob held not ineffective because intent was obvious and counsel, in arguing defendant was not guilty of first degree murder, was establishing candor with the jury). It is certainly plausible that an attorney defending someone with such a mountain of incriminating evidence against him would be willing to not highly contest guilt in hopes of gaining credibility for a more lenient sentence.
Next, the defendant asserts counsel prejudiced him by displaying hostility toward prosecution witnesses. On two occasions, counsel's cross-examinations turned physical, prompting the prosecutor to request an instruction that defense counsel "not put his hands on the witness." In addition, counsel's aggressive style during a reenactment of the "struggle" between the victim and the defendant resulted in an admonishment from the trial court. While counsel's strong-arm tactics were inappropriate, they did not rise to a level which would cause the defendant to suffer substantial prejudice, considering the overwhelming evidence of guilt. Moreover, counsel sensibly employed a gentler approach during cross-examination of adversarial witnesses at the penalty phase.
Finally, the defendant contends counsel was deficient by (1) failing to object to the introduction of gruesome photographs; (2) failing to object to the State's improper arguments during their closing and rebuttal arguments; (3) failing to present any DNA evidence during the admissibility hearing; and (4) failing to make a record of the unrecorded bench conferences. However, given that the arguments[21] underlying relator's ineffective assistance claims have no merit, counsel committed no error in not proceeding differently.
With this situation as the backdrop, the defendant has not "overcome the strong presumption that [counsel's actions] `might be considered sound trial strategy.'" Strickland, 466 U.S. at 689, 104 S.Ct. at 2065 (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)). The Strickland test of ineffective assistance affords a "highly deferential" standard of review to actions of counsel to eliminate, as far as possible, "the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland 466 U.S. at 689, 104 S.Ct. at 2065. This Court therefore "does not sit to second-guess strategic and tactical choices made by trial counsel." State v. Myles, 389 So.2d 12, 31 (La.1979). The defendant has obviously not demonstrated that counsel's performance rendered his trial unfair or that the result is unreliable. Strickland, 466 U.S. at 687, 104 S.Ct. at 2064; Lockhart, 506 U.S. at 372, 113 S.Ct. at 844. Therefore this assignment of error has no merit and does not present reversible error.
The remainder of this assignment of error will discuss counsel's alleged ineffectiveness during the penalty phase.
A defendant in the penalty phase of a capital trial is entitled to the assistance of a reasonably competent attorney acting as a diligent, conscientious advocate for his life. State v. Berry, 430 So.2d 1005, 1007 (La.1983); State v. Myles, 389 So.2d 12, 28 (La.1979) (on reh'g). The role of an attorney at a capital sentencing proceeding resembles his role at trial in that he must "ensure that the adversarial testing process works to produce a just result ..." Burger v. Kemp, 483 U.S. 776, 788-89, 107 S.Ct. 3114, 3122-26, 97 L.Ed.2d 638 (1987). When a defendant challenges the effectiveness of his counsel at the penalty phase, the court must determine whether there is a reasonable probability *580 that, absent counsel's errors, the sentencers would have concluded the balance of aggravating and mitigating circumstances did not warrant death. State v. Sanders, 93-0001, pp. 25-26 (La.11/30/94), 648 So.2d 1272, 1291. Unless the defendant shows both a deficient performance and prejudice, the court cannot find that his death sentence resulted from a breakdown of the adversarial process which rendered the result unreliable. Id.
The defendant first takes issue with a question posed by counsel during direct examination of Dr. Salzer, the defense expert in clinical psychology. In defendant's view, counsel's question, "And what would you expect in a person that committed a crime as atrocious as this?" could be taken as a concession of an aggravating factor which the State must prove beyond a reasonable doubt, i.e., the crime was committed in an especially heinous, atrocious, or cruel manner. However, when read in context, the question showed the instant offense constituted atypical behavior for the defendant who did not have a psychological profile associated with violence. Even assuming this brief question influenced the jury's finding of this statutory aggravating circumstance, which was not supported by the evidence as discussed in assignment of error nine, the failure of one statutory aggravating circumstance does not invalidate others. In light of the other aggravating circumstances found by the jury (the offender was engaged in the perpetration of aggravated kidnapping, armed robbery, and aggravated rape), which were supported by substantial evidence presented at trial, counsel's description of the instant offense as atrocious did not prejudice the defendant.
Next, the defendant complains counsel engaged in "overly racist" questioning of the defendant's family and friends when he repeatedly asked whether the defendant had used the words "ho," "whore," or "bitch" to describe women. All the witnesses answered negatively. While counsel's inquiry was inarticulate, painting the defendant as a polite young man, respectful towards women, appears to be the intent of this line of questioning. As discussed above, the defense strategy focused on showing how the defendant's actions in this case were highly aberrant. In this instance, the defendant's claim appears more hindsight dissatisfaction with an unsuccessful strategy than ineffective assistance. See State v. Felde, 422 So.2d 370, 393 (La.1982) (fact that a particular strategy is unsuccessful does not establish ineffective assistance).
Finally, in closing argument, the defendant contends counsel improperly alluded to the long appellate process awaiting the victim's and defendant's families by stating:
I think Jessie is a tragedy, and I think the event is a tragedy. I think that these two families are going through, and will have to go through, you know, if you return the death penalty, they are on a four year, six year, ten year, fifteen year emotional roller coaster. Both families. Emotional roller coaster. They have all suffered.
The defendant analogizes counsel's remarks to the prosecutor's argument condemned by the United States Supreme Court in Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). In Caldwell, the prosecutor emphasized to jurors their sentencing choice was automatically reviewable, thus leading them to believe responsibility for determining the appropriateness of the defendant's death sentence lay elsewhere. Id., 472 U.S. at 329-30, 105 S.Ct. at 2639-40. On reaching the merits, the United States Supreme Court found the State may not diminish the jury's sense of responsibility of its sentencing determination by suggesting its verdict is not final and is subject to review by a higher court. Id., 472 U.S. at 335-37, 105 S.Ct. at 2643. Thus, the availability of appellate review to a capital defendant sentenced to death "is wholly irrelevant to the determination of the appropriate sentence." *581 Id., 472 U.S. at 337, 105 S.Ct. at 2643.
Although counsel indirectly returned to the often protracted appellate process in capital cases in his closing argument, jurors were not told or encouraged to believe that they were not responsible for the outcome. See State v. Scales, 655 So.2d 1326, 1334-35 (La.1995 ) (State came close but did not cross the line by telling jurors that "you're not responsible for [defendant] facing this death verdict ... And I don't want you to ... feel guilty, or feel like it's your responsibility...."). Instead, counsel's remarks reproduced above focused on the lengthy appellate process awaiting the families if the jury returned a death verdict thereby implying that a life sentence would ease their pain. Thus, contrary to the defendant's claim, counsel's comments did not run afoul of the Caldwell decision prohibiting arguments which diminish the jury's sense of responsibility for the verdict and sentencing recommendation. Consequently, this assignment is without merit and presents no reversible error.

PROSECUTORIAL MISCONDUCT

Assignment of Error No. 10
The defendant maintains the State engaged in prosecutorial misconduct by misstating the law during voir dire and making improper comments during the guilt and penalty phases.
First, the defendant contends that the State repeatedly misstated the law regarding mitigation. In support of his claim, the defendant reproduced the following excerpts from the comments made by the prosecutors during voir dire examination:
Now, the court has read to you a list, in this book, of mitigating circumstances. Just because the list is there, doesn't mean that there's going to be any evidence of it. Those are possible choices of mitigating circumstances that the defense, if they choose, and if they have evidence of, may present to you. You can't just get up and read the list and say you have got to consider these. They have got to present evidence for you to the [sic] consider these.
(Prosecutor McElwee)
In order to sit on this jury, you must consider the following mitigating circumstances. You can consider them. That doesn't mean you have to accept them. You can consider them for purposes of considering(Prosecutor Gracianette)
Now, you must be able to consider all those [mitigating circumstances] in regard to this matter. That doesn't mean you cannot reject them after hearing the evidence which is presented to you and impose the death penalty, but you must at least have the ability to consider them. (Prosecutor Gracianette)
The defendant argues these comments improperly informed the jury the defense had an affirmative obligation to present mitigating evidence before the jury could consider mitigation and that the jurors were free to disregard mitigating evidence. After the first comment reproduced above, defense counsel objected and the trial court addressed it in an off-the-record bench conference. Prosecutor McElwee then informed the jury that "the court will instruct you on the mitigating circumstances, and the court will instruct you that you shall, you must, consider the mitigating circumstances ..." As for the next two comments, defense counsel moved for a mistrial both times, which the trial court denied. Nevertheless, in both instances, the trial court admonished the jury to disregard the State's comments and further instructed the State to rephrase its question regarding mitigating circumstances.
Next, the defendant asserts that the State continued making improper comments during its penalty phase closing argument when the prosecutor urged that the defendant's lack of a criminal record should not be considered mitigating. However, a review of the transcript indicates *582 the prosecutor was referring to the defendant's lack of "personal" or psychological problems as indicated by Dr. Salzer's testimony, the defense expert in clinical psychology.[22] Thus, contrary to the defendant's claim, the prosecutor did not attempt to downplay the defendant's lack of a prior record, a mitigating circumstance under La.Code Crim. Proc. art. 905.5(a).
Finally, in a footnote, the defendant also claims that during voir dire, the State misstated law when the prosecutor described reasonable doubt as "doubt that will give rise to a grave uncertainty in your mind," and improperly informed the jury they were to "weigh" the mitigating and aggravating circumstances. It should be noted that defendant's trial counsel did not object to the prosecutor's statements of the law. Thus, counsel waived any claim based upon it. La.Code Crim. Proc. art. 841; La.Code Crim. Proc. art. 905.3; State v. Taylor, 93-2201, pp. 5-8 (La.2/28/96), 669 So.2d 364, 367-69.
In any event, this court has consistently held that a prosecutor's misstatements of law during voir dire, or in opening and closing remarks, do not require reversible error of a defendant's conviction if the court properly instructs the jury at the close of the case. State v. Cavazos, 610 So.2d 127, 128-29 (La.1992); State v. Holmes, 388 So.2d 722, 727 (La.1980).
Such was the case here. Even assuming the prosecutor made misstatements during voir dire, the trial court properly instructed the jury on mitigating circumstances and the reasonable doubt standard. Furthermore, as discussed above, the trial court admonished the jury to disregard the prosecutor's remarks on two occasions. Under the circumstances, this claim of prosecutorial misconduct is not reversible error.
The defendant also contends that the prosecutor made a series of comments during its guilt phase closing arguments, "calculated to arouse racial prejudice in the all-white jury that was seated."
First, the defendant maintains the prosecutor made a point of remarking that "the case developed through police investigation but started with the finding a nude white female body on the banks of the Middle Pearl River." (Emphasis added by defendant). However, the race of the body found near the river was important to the police investigation because the finding of a white female matched the description given by the victim's husband when he reported her missing to police. When viewed in critical context, the prosecutor's remark is innocuous rather than inflammatory.
Next, the defendant asserts that the State's argument focused on the rape of the victim "in a manner calculated to convey to the jury the particular repugnancy with which the rape of a white woman by a black man has historically been viewed through white eyes." Specifically, the defendant points to the prosecutor repeatedly stating that the victim did not consent to sex with the defendant under any circumstances and further describing the victim as "humiliated and defiled and contaminated by him." The defendant also argues that the prosecutor played on the supposed sexual appetite of the black man for the white woman by commenting:
If he just wanted to have what he described as "sex." He just wanted to *583 have sex with her. She could have kept her top on. She could have kept her bra on, her vest, her red sweater. But he wanted her completely naked. Vulnerable, weak. He wanted to see all of her. He didn't want to just have her. He wanted to degrade her. He wanted to humiliate her. He wanted every stitch of clothing that she had, forced her to lay down in the back of that vehicle, while he entered her. It's one of the most horrible things that could happen to any human being.
The defendant also complains the prosecutor suggested the defendant targeted the victim because she was special.
Louisiana jurisprudence on prosecutorial misconduct allows prosecutors wide latitude in choosing closing argument tactics. See State v. Martin, 539 So.2d 1235, 1240 (La.1989) (closing arguments referring to "smoke screen" tactics and defense "commipinkos" held inarticulate but not improper); State v. Copeland, 530 So.2d 526, 545 (La.1988) (prosecutor's waving a gruesome photo at jury and urging jury to look at it if they become "weak kneed" during deliberations held not improper). In addition, La.Code Crim. Proc. art. 774 confines the scope of argument to "evidence admitted, to the lack of evidence, to conclusion of fact that the state or defendant may draw therefrom, and to the law applicable to the case." The trial judge has broad discretion in controlling the scope of closing argument. State v. Prestridge, 399 So.2d 564, 580 (La.1981). Even if the prosecutor exceeds these bounds, the court will not reverse a conviction if not "thoroughly convinced" that the argument influenced the jury and contributed to the verdict. See State v. Martin, 93-0285, p. 18 (La.10/17/94), 645 So.2d 190, 200; State v. Jarman, 445 So.2d 1184, 1188 (La.1984); State v. Dupre, 408 So.2d 1229, 1234 (La.1982).
These statements may appear inflammatory when removed from their critical context. Considering the closing arguments made by the State and the defense in their entirety, the words reproduced above have a different meaning than the racially charged message alleged by the defendant. In fact, most of the challenged remarks were responses to defense counsel's opening statement in which he downplayed the violent nature of the rape by noting that the victim was not beaten up and her clothes were all in order. While not disputing that rape occurred, defense counsel also speculated that the victim "brought up the subject" of sex as a means to secure her release. Against this backdrop, the prosecutor's diatribe as a whole was designed to combat the defense theory of blaming the victim for putting ideas into the defendant's head and counter the defendant's description of the encounter in his confession as "sex." At any rate, defense counsel failed to object to any of these remarks and thereby waived any claim based on prosecutorial misconduct. La.Code Crim. Proc. art. 841; Taylor, 93-2201, p. 7, 669 So.2d at 369 (contemporaneous objection rule applies to errors committed at guilt stage of a capital case).
Additionally, the defendant contends the prosecutor engaged in improper argument by repeatedly mentioning the defendant's lack of remorse and commenting on matters of personal knowledge or facts outside of the record, such as the defendant's thought process. However, this court will not reverse a conviction if not "thoroughly convinced" that the argument influenced the jury and contributed to the verdict. See State v. Martin, 93-0285, p. 18 (La.10/17/94), 645 So.2d 190, 200; State v. Jarman, 445 So.2d 1184, 1188 (La.1984); State v. Dupre, 408 So.2d 1229, 1234 (La.1982). The comments referred to in defendant's brief, even if outside the proper scope of closing argument, do not require relief. The defendant was convicted based on substantial evidence of guilt, and it does not appear the prosecutor's comments contributed to the verdict.
The defendant's final claim of misconduct allegedly occurred during the *584 State's penalty phase closing argument when the prosecutor stated:
Mr. Foster testified that he's been working with lifers, those people who have been convicted of the crimes of aggravated rape, aggravated kidnapping, second degree murder and first degree murder. Those were all sentences for those individual crimes. I am not here to tell you that life in prison is easy. See, Jessie had a choice.
After robbing, kidnapping and raping Molly Elliot, he could have stopped right there and he would be spending the rest of his life in jail. But he takes the next step. He commits the most horrible, vicious, cruel crime known to man: he takes the life of a human being, who was special. And what's the penalty he wants you to impose for that most horrible, vicious, cruel crime? Life.
Jessie chose death. Jessie Hoffman on the edge of the Middle Pearl River had a choice and he chose death. After considering all the aggravating and mitigating circumstances in this case, ladies and gentlemen, there is only one verdict. Impose the death penalty. Don't let him get away with murder. Thank you.
According to the defendant, this argument improperly suggested the underlying felonies committed by the defendant, (aggravated kidnapping, armed robbery, and aggravated rape), "already required his imprisonment for life and thus a life sentence would let him get away with murder."
Defense counsel did not object to this line of argument; however, as this case was tried before State v. Wessinger, 98-1234, (La.5/28/99), 736 So.2d 162, 180-81 (contemporaneous objection rule will apply to penalty-phase errors as well as guilt-stage errors in capital cases heard after the date of decision), the failure of counsel to object does not bar this court's review of the defendant's claim. Although the defendant characterizes the prosecutor's argument as an "impermissible proportionality" survey, the State maintains the prosecutor's remarks were made in response to evidence introduced by the defense during the penalty phase regarding the lifestyle of a "lifer."
During the penalty phase, the defense presented testimony of Burt Foster, an expert in executive clemency and corrections. On direct examination, he testified that "no one who has been convicted of a first degree murder involving a rape has ever gotten a commutation of sentence in the history of first degree murder in Louisiana." This line of questioning continued without objection during cross-examination as Mr. Foster testified about mandatory life sentences for second degree murder, aggravated kidnapping, and aggravated rape. Consequently, the defense unwittingly opened the door to this line of argument through the testimony of its expert witness. Furthermore, it appears that in his closing argument, the prosecutor was attempting to distinguish offenders who had committed single felonies such as aggravated rape, which requires a life sentence, from the defendant who committed murder along with three underlying felonies which elevates the instant offense to a capital crime. In this situation, and considering the "good sensibility and fair-mindedness of juries," See Taylor, supra, 93-2201, p. 21 669 So.2d at 375, it does not appear that the prosecutor's comments necessarily contributed to the death verdict, i.e., that they undermine confidence in the jury's sentencing verdict. State v. Thibodeaux, 98-1673, p. 15 (La.9/8/99) 750 So.2d 916 ("in the context of Rule 28 review, the existence of an arbitrary factor requires this court to find an error of such magnitude that it undermines confidence in the jury's verdict, essentially the same kind of error that would support the prejudice prong under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), for claims of ineffective assistance.") Moreover, the State's comments in this case appear less egregious than similar arguments made in other capital cases. See also State v. Scales, *585 93-2003, p. 10-12 (La.5/22/95), 655 So.2d 1326, 1334 (district attorney's references to Angola lifestyle, and comments diminishing the jury's responsibility for imposing death, although improper, did not constitute reversible error held harmless). Accordingly, the defendant's claims about the State's arguments at the guilt and penalty phase do not warrant relief.

SUFFICIENCY OF EVIDENCE

Assignment of Error No. 16
In this assignment, the defendant asserts that the jury convicted him on insufficient evidence. Specifically, the defendant claims the State's evidence of specific intent was based on purely circumstantial evidence contradicted by the defendant's confession in which he stated the gun went off accidentally while he and the victim struggled.
"In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).... [T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." State v. Captville, 448 So.2d 676, 678 (La.1984). When circumstantial evidence is used to prove the commission of the offense, La.Rev. Stat. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This statutory test works with the Jackson constitutional sufficiency test to evaluate whether all evidence, direct and circumstantial, is sufficient to prove guilt beyond a reasonable doubt to a rational jury. State v. Rosiere, 488 So.2d 965, 968 (La.1986). To obtain a conviction for first degree murder, the prosecution must prove all elements of the crime beyond a reasonable doubt, including specific intended to kill the victim. La.Rev.Stat. 14:30. Specific intent may be inferred from circumstances surrounding the offense and the conduct of the defendant. La.Rev. Stat. 14:10(1); State v. Martin, 92-0811, p. 3 (La.App. 5th Cir.5/31/94), 638 So.2d 411, 413-14. Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. State v. Procell, 365 So.2d 484, 492 (La.1978).
The State's case for specific intent rested on forensic evidence concerning the nature of the wound. According to the coroner's forensic examination, the victim was shot from a distance of approximately eighteen to twenty-four inches away. The coroner further testified the location of the fatal wound on the victim's head made it unlikely the defendant and victim were struggling over the gun during the shooting. Instead, the coroner indicated that if the victim had reached for the defendant's wrist, the wound would have appeared in the victim's torso as opposed to her head. The coroner also testified the victim's knees and legs showed superficial abrasions indicating that the victim was on her knees before her death. When asked if a head wound would be likely if the victim was kneeling, the coroner responded affirmatively.
The evidence does not contradict the State's theory of the case. In fact, most cases which have found evidence sufficient to support an inference of specific intent have relied on the proximity of the gunman to the victim: close-range or pointblank. See State v. Lindsey, 543 So.2d 886, 902-03 (La.1989); State v. Maxey, 527 So.2d 551, 555 (La.App. 3d Cir.1988), writ denied, 541 So.2d 868 (La.1989) (specific intent inferred when defendant put gun to head of victim and fired); State v. Latchie, 535 So.2d 541, 542 (La.App. 3d Cir.1988) (specific intent inferred when defendant shot victim once through windshield, striking the victim in head, and then moved to side of car and shot four more times into the car). The trier of fact makes *586 credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge upon the "fact finder's discretion only to the extent necessary to guarantee the fundamental due process of law." State v. Mussall, 523 So.2d 1305, 1310 (La.1988). In the instant case, the application shows a rational trier of fact could have believed, on the basis of the coroner's testimony and many circumstances of the offense introduced at trial, that the defendant shot the victim with specific intent to kill her and not believed the shooting was an accident. This assignment lacks merit, and does not present reversible error.

RECORDATION OF BENCH CONFERENCES

Assignment of Error No. 17
The defendant maintains the trial court's failure to record bench conferences precludes adequate appellate review.[23]
La. Const. art. I § 19 guarantees defendants a right of appeal "based upon a complete record of all the evidence upon which the judgement is based." Additionally, La.Code Crim. Proc. art. 843 provides:
In felony cases, and on motion of the court, the State, or the defendant in misdemeanor cases tried in a district, parish, or city court, the clerk or court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel.
Material omissions from the transcript of the proceedings at trial bearing on the merits of an appeal will require reversal. See State v. Robinson, 387 So.2d 1143 (La.1980) (reversal required when record failed to contain the testimony of a State and defense expert witness); State v. Ford, 338 So.2d 107 (La.1976) (reversal required when record missing the testimony of four State witnesses and the voir dire of prospective jurors). On the other hand, inconsequential omissions or slight inaccuracies do not require reversal. State v. Goodbier, 367 So.2d 356, 357 (La. 1979) (reversal not required when record does not include a transcript of the voir dire examination and affidavit of court reporter indicated that counsel made no objections during voir dire).
This court has never articulated a per se rule either requiring the recording of bench conferences or exempting them from the scope of La.Code Crim. Proc. art. 843. Still, art. 843's description of "objections" and "arguments" will normally apply only to objections made in open court and the arguments of counsel in closing, because only these objections and arguments rise to a level of materiality sufficient to invoke art. 843.[24]State v. *587 Clark, 93-0903, pp. 2-3 (La.App. 3d Cir. 1994), 638 So.2d 225, 227; State v. Richardson, 529 So.2d 1301, 1308 (La.App. 3d Cir.1988). Similarly, Art. I. § 19's command to record "evidence" does not encompass bench conferences, at least, not ones that do not satisfy the materiality requirements of La.Code Crim. Proc. art. 843.
The defendant complains primarily about four unrecorded bench conferences which occurred during the guilt phase.[25] Additionally, the trial court conducted the charge conferences off the record. The defendant also notes that the initial discussion of the jury's penalty phase questions directed toward the existence of a juvenile record for defendant occurred off the record.
However, the defendant fails to clarify that after two of the unrecorded bench conferences cited above, the trial court stated for the record the substance of the defendant's objections along with reasons for its rulings. As for the remainder of the defendant's examples, nothing in the record suggests the unrecorded conferences had a discernible impact on the proceedings nor does the defendant point to any specific prejudice. See State v. Castleberry, 98-1388, pp. 28-29 (La.4/13/99), 758 So.2d 749 (absence from the record of four unrecorded bench conferences did not deny defendant effective appellate review; three of the conferences had no discernible impact on the proceedings and the fourth concerned a mistrial motion whose basis was readily discernible in the recorded testimony of the witness); State v. Brumfield, 96-2667, pp. 14-16 (La.10/28/98), 737 So.2d 660, 669-670 (trial court's failure to have each bench conference and ruling properly transcribed not reversible error when the defendant failed to show that he was prevented from presenting any relevant evidence and thus failed to establish that any prejudice resulted from the absence in the record of the substance of the conferences).
Furthermore, a record review indicates the defense acquiesced in the procedure. Before trial, defense counsel filed a motion requesting complete recordation of all pretrial and trial proceedings.[26] However, when the trial court addressed this motion during a pretrial hearing, defense counsel made clear the parties could conduct off-the-record discussions and further stated, "if we think it's relevant or material then we'd ask the court to have the stenographer present and we'll do that at the court's discretion." The trial court granted the motion. As discussed above, the trial court followed through on defense counsel's request by summarizing substantive unrecorded conferences for the record. Consequently, this assignment lacks merit, and presents no reversible error.

Capital Sentence Review
Under La.Code Crim. Proc. art. 905.9 and La.S.Ct.R. 28, this court reviews every sentence of death imposed by courts of this state to determine if it is constitutionally excessive. In making this determination, the court considers whether the jury imposed the sentence under influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender. In *588 the instant case, the Department of Public Safety and Corrections ("DOC") has submitted a Capital Sentence Investigation ("CSI"). In addition, the defendant has filed objections to the CSI and the Uniform Capital Sentence Report ("UCSR"); however, it does not appear that this court has received the UCSR from the trial court. The State also submitted a Sentence Review Memorandum.
The CSI indicates that the defendant is an African-American male born on September 1, 1978. He was eighteen years old at the time of the murder. He is unmarried; however, shortly before his arrest, he learned his girlfriend was pregnant with his child.[27] She recently gave birth to their son, Jessie Dean Smith, who is now one year old.[28] The defendant is one of five children born to his mother. His twenty-five year old brother, Charles Fields, was shot and killed in New Orleans on May 31, 1998.
The defendant graduated from John F. Kennedy High School in 1996. According to the defendant, he was starting quarterback for the football team. His mother indicated he received straight A's through the 11th grade; however, his grades dropped when he met his girlfriend.
As for his employment history, the defendant indicated he worked at a Taco Bell for eight months in 1995 but quit because of late hours. According to the CSI, this job represents the defendant's longest period of employment. The defendant maintained he worked at Panchos' Restaurant at the end of 1995; however, he left after one and one-half months for another job. He also worked at Key West Inn for three months but claimed he quit when his paychecks started bouncing. The CSI verifies that the defendant worked at a Sav-A-Center from May to June of 1996. At the time of his arrest, he was working as a valet for USA Parking. He had been employed as such for approximately fifteen days.
The CSI indicates the defendant is classified as a first felony offender. On his arrest date, the defendant had a pending charge against him for disturbing the peace set for trial on October 22, 1998. As for a juvenile record, the defendant shows arrests for trespassing and unauthorized entry of a business; however, the juvenile court has no record of prosecution or adjudication of these.
A psychiatric evaluation revealed the defendant has no prior psychiatric history and has never taken psychiatric medication. At the time of his evaluation, the defendant showed appropriate initial anxiety, but soon became comfortable and cooperated. The defendant indicated that he copes with depression by praying and trying not to show any weakness. Testing showed the defendant has an excellent memory and good concentration. No psychiatric diagnosis was indicated.

Passion, Prejudice, and other Arbitrary Factors
The defendant maintains two elements injected passion, prejudice, arbitrariness, and caprice into the proceedings: (1) the trial court erroneously denied his motion for a change of venue due to pretrial publicity; and (2) defense counsel used the "blame the victim" defense. However, these factors were treated in depth above in the individual assignments of error and were found to have no merit and present no reversible error. An independent review *589 of the record does not provide any indicia of passion, prejudice or any other arbitrary factors.
The defendant also argues that race permeated the instant case which involved a black defendant and a white victim. All twelve jurors were white. Despite defendant's claims, there is no objective evidence of racism in the instant case. Although defendant is African-American and he raped and killed a white female, there is no other support for defendant's argument that his sentence is tainted because of his race. See State v. Taylor, 93-2201, pp. 34-35 (La.2/28/96), 669 So.2d 364, 381-82 (no passion or racial prejudice resulted from fact that defendant was black male, jurors were all white, and two murder victims were white). Consequently, the defendant's argument is unsupported and presents no reversible error.

Aggravating Circumstances
At trial, the State argued the following aggravating circumstances existed: (1) that the offender was engaged in the perpetration or attempted perpetration of an aggravated kidnapping, armed robbery, and aggravated rape; and (2) that the offense was committed in an especially heinous, atrocious, or cruel manner. La.Code Crim. Proc. art. 905.4(A)(1)(7). The jury found the existence of all the aggravating circumstances urged by the State.
The record fully supports a finding that the instant murder was committed in the course of an aggravated kidnapping, armed robbery, and aggravated rape. Any one of these enumerated felonies, in and of itself, is sufficient to allow for a death penalty affirmation. Even if we were to assume the evidence failed to support that the murder was "committed in an especially heinous, atrocious, or cruel manner," the inclusion of this aggravating circumstance did not interject an arbitrary factor into these proceedings because evidence of the manner in which the offense was committed and of the nature of the victim's injuries were all relevant and properly admitted at trial. The failure of one aggravating circumstance does not invalidate others, properly found, unless introduction of evidence in support of the invalid circumstance interjects an arbitrary factor into the proceeding. See State v. Roy, 681 So.2d 1230, 1242 (La.1996). There was no reversible error in the jury finding these aggravating circumstances.

Proportionality
Comparative proportionality review remains a relevant consideration in determining excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 711-12 (La.1990). This court, however, has vacated only one capital sentence as disproportionate to the offense and the circumstances of the offender. State v. Sonnier, 380 So.2d 1, 7-8 (La.1979).
We review death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an arbitrary inference arises. Sonnier, supra.
Since 1976 there have been twenty-four successful prosecutions for first degree murder in the 22nd Judicial District Court which comprises the Parishes of St. Tammany and Washington. Of these cases, jurors have returned the death penalty nine times, including the instant case. However, three of these cases resulted in the annulment of the death penalty and the imposition of a life sentence.[29] One of *590 the nine cases in which the jury returned a death sentence involved aggravated rape and heinousness as aggravating factors. In that case, co-defendants Robert Lee Willie and Joseph Vaccaro offered a ride to the victim, Faith Hathaway, outside a disco in Mandeville. The victim, an eighteen-year-old woman, was celebrating her last night as a civilian before entering the United States Army. Instead of taking the victim to her home as requested, the defendants took her to a heavily wooded, secluded gorge in Washington Parish. Willie or Vaccaro, or both, raped the young woman there. One of the men repeatedly stabbed the victim in the throat while the other held her hands. Following their arrests, both defendants admitted seizing the victim, but each accused the other of raping her and slashing her throat. A jury subsequently found Joseph Vaccaro guilty of first degree murder and sentenced him to life imprisonment without benefit of parole, probation, or suspension of sentence. State v. Vaccaro, 411 So.2d 415 (La.1982). Following Robert Lee Willie's trial, the jury convicted him of first degree murder and recommended the death penalty. This court conditionally affirmed his conviction, vacated the sentence, and remanded. State v. Willie, 410 So.2d 1019 (La.1982). A new sentencing hearing resulted in the imposition of another death sentence. State v. Willie, 436 So.2d 553 (La.1983). Robert Lee Willie was executed in 1984.
In three of the nine capital cases, the jury found armed robbery and heinousness as aggravating factors. The most recent case, that of David Wilson, involved a defendant who fatally shot a motorist for gas money. State v. Wilson, 467 So.2d 503 (La.1985). In Wilson, this court did not believe heinousness was supported by the record, but affirmed the death penalty due to armed robbery. Wilson, 467 So.2d at 520-22. The federal Fifth Circuit subsequently remanded the case for an evidentiary hearing due to ineffective counsel. Wilson v. Butler, 825 F.2d 879 (5th Cir. 1987). His co-defendant, Larry Taylor, received a life sentence following his conviction for first degree murder. State v. Taylor, 469 So.2d 46 (La.App. 1st Cir. 1985). The next case is that of David Rushing, who used a shotgun to rob and kill a cab driver. State v. Rushing, 464 So.2d 268 (La.1985). The federal Fifth Circuit later vacated his death sentence due to improper introduction of victim impact evidence and remanded the case on that basis. Rushing v. Butler, 868 F.2d 800 (5th Cir.1989). Rushing's co-defendant, Jeffrey Fussell, pled guilty and was sentenced to life imprisonment. Rushing, 464 So.2d at 271, n. 2. The third case involves Frederick Kirkpatrick, who robbed and killed an elderly man by striking him in the head with a heavy glass object, implanting a butcher knife into the victim's chest, and shooting him in the head. State v. Kirkpatrick, 443 So.2d 546 (La.1983). The federal Fifth Circuit subsequently remanded his case for a hearing based on a Brady violation. Kirkpatrick v. Butler, 870 F.2d 276 (5th Cir.1989). His co-defendant was convicted of first degree murder and sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. State v. Faulkner, 447 So.2d 1139 (La.App. 1st Cir.), writ denied, 449 So.2d 1345 (La.1984).
Finally, in one instance, a jury recommended death after finding the sole aggravating circumstance of armed robbery. In that case, co-defendants Roy Clark, Jr. and Brent Mikell, were accused of shooting the victim during an attempted armed robbery. Their death sentences were subsequently set aside, due to the then unconstitutionality of the death penalty and the trial court imposed life sentences. State v. Clark, 340 So.2d 208 (La.1976).
A review of these capital verdicts from St. Tammany and Washington Parishes does not suggest a disproportionately *591 harsh sentence. Given the scarcity of factually similar cases from the 22nd Judicial District, this court will look beyond that judicial district and conduct the proportionality review on a state-wide basis. A state-wide review of cases reflects that jurors often return the death penalty when innocent adult victims have been robbed or raped then murdered in or near their home or car. See State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8; State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116 (death penalty affirmed for defendant who stabbed victims while in their house for purpose of robbery); State v. Burrell, 561 So.2d 692 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991) (death penalty affirmed for defendant who murdered husband and wife in order to gain entry to take money and other valuables from their house was not disproportionate to sentence imposed upon others convicted for murder); State v. Eaton, 524 So.2d 1194 (La.1988) (death penalty affirmed for defendant who killed victim as she was about to get into her car); State v. Wingo, 457 So.2d 1159 (La.1984)(defendant's death sentence was affirmed for defendant who killed victims in their home); State v. Celestine, 443 So.2d 1091 (La.1983) (death penalty affirmed for defendant who raped and killed victim in her home); State v. Narcisse, 426 So.2d 118 (La.1983) (death penalty affirmed for defendant who killed victim during an armed robbery of her home); State v. Thompson, 516 So.2d 349 (La.1987) (death sentence affirmed for defendant who shot victim during armed robbery outside of victim's car); State v. Brown, 514 So.2d 99 (La. 1987) (death penalty affirmed for defendant who killed victim while victim was returning to his car and during the course of armed robbery); State v. James, 431 So.2d 399 (La.1983) (death penalty affirmed when victim was shot while getting out of his car and defendant was robbing him at gunpoint). In light of the relevant case law, it was certainly reasonable for the jury to return the death penalty based on the facts of this case.
Even if we were to assume that the facts of this case would be less extreme than other cases, although we believe they are just as extreme if not more so, it was still within the jury's discretion to impose the death penalty based on the aggravating circumstances. The death sentence is not necessarily disproportionate because the case is factually similar to a case which received a life sentence. State v. Eaton, 524 So.2d 1194 (La.1988).
Furthermore, as noted above, at the time of the offense, defendant was eighteen years old. This court has affirmed death verdicts for defendants as young as seventeen years old at the time of the offense. State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865, cert. denied, 522 U.S. 935, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997); State v. Comeaux, 93-2729 (7/1/97), 699 So.2d 16. Compared to these cases, it cannot be said that the death sentence in this case is disproportionate.

DECREE
For the reasons assigned herein, defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1)the Defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the Defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules for rehearing of denial of certiorari, or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La.Code Crim. Proc. art. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1)to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La.Rev.Stat. 15:149.1; and (2)to litigate *592 expeditiously the claims raised in that original application, if filed, in state courts.
NOTES
[*] Marcus, J. not on panel. Rule IV, Part 2, Section 3.
[2] The defendant's trial, rather than the offense itself, rated as the sixth biggest news story in St. Tammany following news coverage of the kidnapping, rape, and murder of eleven-year-old Lorin Easterling. Reports concerning Panos Tsolainos, who was charged with running over his wife with his car while out on bond for allegedly hiring a hit man to kill his wife, also rated higher than coverage of the defendant's trial.
[3] WVUE Fox 8 Tape, Elliot murder/ Hoffman arrest (Emphasis added by defendant).
[4] The defendant's claim of racial bias is treated in the Capital Sentence Review section, infra.
[5] In a footnote, appellate counsel suggests that prospective jurors may have been reading newspapers during jury selection. On the fourth day of voir dire, a deputy sheriff found copies of the June 17th editions of the Slidell Sentry News and the Times Picayune in the courtroom. The trial court reviewed the newspapers and found one news article from the Slidell paper titled, "Trial Still Awaiting for a Jury." According to the trial court, the news story "contain[ed] no further factual scenario than related to the potential jurors by the district attorney while conducting the voir dire examination." Mr. Finch, a prospective juror, admitted that the newspapers belonged to him and that he had read the classified ads while sitting in the courtroom because he was looking for a job. Extensive questioning of the jury pool present that day indicated that none of the prospective jurors had read the newspapers.
[6] The jurors excused by the trial court were: Ms. Lien, Mr. Rogers, Ms. Huval, Mr. D'Agostino, and Mr. Lirette.
[7] The trial court granted the State's challenge for cause after Mr. Cooper unequivocally expressed his opposition to the death penalty. The trial court further noted that Mr. Cooper's personal problems stemming from his job as a truck driver and sharing joint custody of his child might create a hardship. Defense counsel lodged an objection "on constitutional grounds."
[8] According to the prosecutor, the State exercised peremptories against the following white jurors for similar reasons as Mr. Galatas: (1) Mr. Scazzafavo, who indicated he "could go one way or the other. You have to wait to hear everything." (2) Ms. Corrin, who stated "I am not against the death penalty, and I am not rah, rah for it either." (3) Mr. Tortorich, who maintained that he could follow the law even though he personally did not agree with the death penalty. (4) Mr. Boudreaux, who was unsure as to whether he could consider the death penalty.; and (5) Mr. Pope, who repeatedly stated that he could consider the death penalty but the state felt he was not strong.
[9] The following prospective jurors from this panel were all questioned about the death penalty during individualized voir dire: Mr. Bacharach, Mr. Richardson, Mr. Burns, Mr. Lopez, Mr. Laizer, and Mr. Bawser.
[10] It should be noted that defense counsel described the instant offense as a "horrible crime," rather than the prospective juror.
[11] Without further comment, the defense brief notes that Ms. Miller "testified that she personally met with Walter Reed [the District Attorney of the 22nd Judicial District] to discuss her son's arrest for shoplifting." Defense counsel at trial did not raise this as a ground for dismissal during voir dire, nor does it appear that appellate counsel is now challenging the juror on that basis.
[12] The exhibits filed with the appellate record do not include the videotape played for the jury. However, the missing exhibit does not bar full review given that the original tape cannot be viewed without special equipment. Furthermore, the defendant's more substantial claim focuses on the prejudicial nature of the videotape based on the cumulation of evidence.
[13] The prosecutor's closing argument reads in pertinent part:

And he dropped his wife on Thanksgiving Eve at her car fully expecting and anticipating that he would see her that evening and they would spend a joyful and festive Thanksgiving Eve and Thanksgiving Day with family and friends.
And when she didn't arrive at approximately 6:30, 7:00, 7:30, 8:00, your imagination runs wild and you expect the worse. And that's what he did. He made a series of phone calls to try to find out what was going on. Called to police, he called local hospitals, he made call after call, hoping to alleviate his worse [sic] fears, hoping that he would get the phone call that would offer an explanation as to, Molly, where are you, where have you been. Well, that call never arrived.
* * *
While we were spending our Thanksgiving Day with our family and friends, at about 8:00 in the morning, Andy Elliot received a phone call. It was a call he never hoped to or expected to receive. It was a call that indicated that they had found a body and we need you to come down to the morgue and identify it. Andy was shown the watch and a ring and he knew it was his wife. And he had to do the hardest thing that a husband, friend, and partner has to do, is to identify his wife at the morgue.
[14] For example, during his closing argument, the prosecutor stated:

Molly was a beautiful person, lovely, decent, good, kind. You could see it in her face ... A beautiful young lady is no longer with us.
[15] The jury's handwritten question along with the trial court's response is located in the record at Rec. vol. VI, p. 1272.
[16] Given this evidence, the jury's question about the possibility defendant nevertheless might have an undisclosed juvenile record reveals considerable sophistication in the jury on the differences accorded by law of adult convictions and juvenile adjudications of delinquency. In fact, the defendant had only a minor record of juvenile arrests with no delinquency adjudications.
[17] The record indicates that defense counsel waived the defendant's presence at the conference regarding the trial court's response to the jury's question. However, as a general rule, no claim of prejudicial error can be based upon the exclusion or absence of a defendant, pending his trial on a criminal charge, from the courtroom, or from a conference between court and attorneys, during argument on or discussion of a question of law. State v. Kahey, 436 So.2d 475, 483 (La.1983).
[18] The Strickland standard was specifically adopted. Lockhart was decided after Washington.
[19] Defense counsel also cast blame on the parking garage management and the victim's employer by questioning them as to whether they escorted women to their cars after hours.
[20] Rec. vol. VIII, pp. 1806-1808 (asking whether potential jurors would want at least half of their own race on their jury).
[21] The underlying claims are treated in assignments of error nos. 13 (photographs), 10 (prosecutorial misconduct), 15(DNA), and 17 (bench conferences).
[22] The prosecutor's statement reads in pertinent part:

Ms. Salzer presented the most confusing picture or portrait of the defendant. He came from a good background, he had no history of problems ... no indication, according to her testing, that the defendant had any serious problem, nothing ... If there were a history of problems and he had some disorders and there were other problems associated, she would be coming in here and using that as a justification for you to spare him. How can she now use the lack of problems in his life as a justification for you to spare him again? That doesn't make sense. It contradicts itself. In other words, there is no excuse.
[23] By defendant's calculations, 103 bench conferences were conducted off the record. Def. Br. at 81. However, a review of the record shows 90 unrecorded conferences. See Rec. vol. VIII, pp. 1898, 1917, 1942; Rec. vol. IX, pp. 2143, 2145, 2174, 2193; Rec. vol. X, pp. 2259, 2291, 2323, 2375, 2419, 2462, 2473, 2477, 2493; Rec. vol. XI, pp. 2501, 2581, 2674, 2691, 2758; Rec. vol. XII, pp. 2980, 3010, 3038, 3056, 3136, 3199; Rec. vol. XIII, pp. 3238 (two), 3241, 3245; Rec. vol. XIV, pp. 3255, 3283, 3284, 3295, 3340, 3378, 3396, 3406, 3431, 3442, 3463; Rec. vol. XV, pp. 3501, 3531, 3533, 3555, 3560, 3570, 3589, 3602, 3616, 3618, 3629, 3632, 3643, 3648, 3719; Rec. vol. XVI, pp. 3795, 3821, 3837, 3839, 3859, 3901, 3932, 3937, 3938, 3945, 3950, 3972; Rec. vol. XVII, pp. 4002, 4030, 4102, 4126, 4127, 4129, 4130, 4174, 201, 4224, 4238; Rec. vol. XVIII, pp. 4287, 4362, 4387, 4396, 4462, 4474, 4476; Rec. vol. XIX, pp. 4515, 4543, 4544.
[24] Even at the federal level, where court reporters have a statutory duty to record verbatim "all proceedings in criminal cases had in open court," 28 U.S.C. § 753, the failure of a reporter to record lengthy bench conferences does not constitute a substantial and significant omission from the record. United States v. Stefan, 784 F.2d 1093 (11th Cir.1986), cert. denied, 479 U.S. 855, 107 S.Ct. 193, 93 L.Ed.2d 125 (1986); United States v. Long, 419 F.2d 91 (5th Cir.1969).
[25] See Rec. vol. XV, p. 3560 (bench conference at defense request during direct examination of victim's husband on victim's hatred of handguns, following which trial court indicated State could proceed "in accordance with bench conference."); Rec. vol. XV, p. 3589 (bench conference at defense request during direct examination of parking garage manager); Rec. vol. XVI, p. 3950 (bench conference at defense request following trial court's ruling that defense DNA expert not required to turn over any information to the State); Rec. vol. XVII, p. 4102 (bench conference at State's request following the playing of defendant's videotaped confession for the jury).
[26] The defendant's original attorney, Donald Pinkston, filed the motion before he withdrew from the instant case.
[27] The defendant complains that the USCR indicates that he was not contributing to the support of his only child at the time of the offense. The defendant contends this statement is misleading because he was incarcerated shortly after he learned of his girlfriend's pregnancy. He further indicates that his indigency prevents him from supporting his child, although he maintains contact with his family and has photographs of his child. Def. Sent. Rev. Memo. at 1.
[28] Although the USCR indicates that the defendant has no other dependents, the defendant points to the testimony of his blind and diabetic grandmother who stated that the defendant frequently lived with her and took her to the doctor.
[29] See State v. Hart, 96-0697 (La.3/7/97), 691 So.2d 651 (first degree murder conviction and death sentence set aside, due to insufficient evidence to support first degree murder, with instructions for trial court to enter judgment of second degree murder and sentence of life imprisonment); State v. Willie, 360 So.2d 813 (La.1978) (first degree murder conviction affirmed, death sentence vacated, due to unconstitutionality of death penalty at time, and remanded for imposition of life sentence); State v. Clark, 340 So.2d 208 (La.1976) (first degree murder convictions affirmed, death sentences annulled due to unconstitutionality and remanded for imposition of life sentences).